**VACUUM CONCRETE CORPORATION OF AMERICA, Plaintiff,**

v.

**AMERICAN MACHINE & FOUNDRY CO., Defendant.**

**No. 67 Civ. 314.**

United States District Court,
S. D. New York.

Jan. 7, 1971.

Patterson, Belknap & Webb, New York City, for plaintiff; Robert P. Patterson, Jr., and Robert D. Sack, New York City, of counsel.

Rogers, Hoge & Hills, New York City, for defendant; Sidney P. Howell, Jr., and Frederick A. Nicoll, New York City, of counsel.

MANSFIELD, District Judge.

In this action brought under our diversity jurisdiction, 28 U.S.C. § 1332, plaintiff Vacuum Concrete Corporation

of America ("Vacuum") claims that defendant American Machine & Foundry Co. ("AMF") breached a contractual duty to make diligent and good faith efforts to exploit a device which Vacuum had licensed to AMF.[1] Vacuum seeks compensatory damages for the breach in the amount of $1,300,000. AMF has moved for summary judgment under Rule 56, F.R.Civ.P., on the ground that no "best efforts" duty can be implied. For the reasons stated below, the motion is granted.

The license agreement ("the Agreement") upon which the present action is based was entered into on October 8, 1964. It is a formal document, representing the fruits of negotiations between Vacuum's President Jacob Creskoff, after consultation with its Chairman, Robert Dowling, and AMF's Vice-President, Rodolfo A. Correa, a member of the New York bar who has specialized in patent law. Under the terms of the Agreement Vacuum granted to AMF an exclusive license to manufacture and sell (within the United States, its territories and possessions) a vacuum lifting and handling device known as the Octopus Lifter, which is the subject of certain patents and technical information owned and controlled by Vacuum. Vacuum retained the right to manufacture and sell, within the area allocated to AMF, Octopus Lifters sufficient to fill up to 50 orders annually, the total sales price not to exceed $300,000 in any year. AMF agreed to pay Vacuum a royalty of $25,000 per year or 10% of net sales of Octopus Lifters, whichever was greater. AMF was given the right to terminate the Agreement after an initial term of two years. Vacuum was given the right to terminate the Agreement after four years if royalty payments in the fourth year were less than $100,000. The Agreement does not contain any express assumption by AMF of an obligation to exploit the licensed

invention or promote sales of Octopus Lifters. The last paragraph of the Agreement provided:

"ARTICLE IX

\* \* \* \* \* \*

"4. This Agreement constitutes the entire agreement and understanding between the parties and supersedes all prior agreements and understandings with respect to Licensed Products whether written or oral. No modification or claimed waiver of any of the provisions hereof shall be valid unless in writing and signed by authorized representatives of the party against whom such modification or waiver is sought to be enforced."

AMF did not make any sales of Octopus Lifters during the first two years of the Agreement. It sought to terminate the Agreement after one year but Vacuum was not willing to permit termination at that time. After two years, AMF terminated the Agreement pursuant to its terms.

Vacuum's complaint (¶ 13) alleges that by reason of the exclusive nature of the license rights granted to AMF and the confidence reposed by Vacuum in AMF as exclusive licensee "there arose an implied covenant on defendant's part to exploit the licensed inventions with reasonable diligence and in good faith." Vacuum claims that AMF breached this alleged implied covenant.

█ It is settled law that the court will imply a duty on the part of an exclusive licensee to exploit the subject matter of the license with due diligence, where such a covenant is essential as a matter of equity to give meaning and effect to the contract as a whole. Wood v. Lucy, Lady Duff-Gordon, 222 N.Y. 88, 118 N.E. 214 (1917); Mechanical Ice Tray Corp. v. General Motors Corp., 144 F.2d 720 (2d Cir. 1944), cert. denied sub nom. Horton v. General Motors

---

1. Vacuum includes in its complaint a second claim for some $4,668.42 allegedly due it from AMF as out-of-pocket expenses it incurred in connection with advising AMF regarding the Octopus Lifters. The motion for summary judgment is not directed at this cause of action, and it will not be considered further in this opinion.

Corp., 324 U.S. 844, 65 S.Ct. 679, 89 L.Ed. 1406 (1945); Guardino Tank Processing Corp. v. Olsson, 89 N.Y.S.2d 691 (Sup.Ct.N.Y.Co.1949). The reasoning of these decisions is that it would be unfair to place the productiveness of the licensed property solely within the control of the licensee, thereby putting the licensor at his mercy, without imposing an obligation to exploit upon the licensee. In effect the court is merely enforcing an obligation which the parties overlooked expressing in their contract or which they considered unnecessary to be expressed. In such circumstances the implied obligation

> "must conform to what the court may assume would have been the agreement of the parties, if the situation had been anticipated and provided for. (Addison on Contracts, 22) Thus whatever obligation is sought to be raised by legal implication, must be of such a character as the court will assume would have been made by the parties if their attention had been called to the subject, and their conduct inspired by principles of justice. Dermott v. State of New York, 99 N.Y. 101, 109, 1 N.E. 242 (1885)."

█ A typical example of an implied covenant to exploit is found in a leading case in New York on the subject, Wood v. Lucy, Lady Duff-Gordon, *supra*. There the defendant, a fashion designer, gave the plaintiff the exclusive privilege of marketing defendant's design. Although the plaintiff did not expressly agree to exploit the design, the court implied such an obligation, since defendant's sole revenue was to be derived from plaintiff's sales of clothes designed by defendant and defendant was thus at the plaintiff's mercy. In this and in similar cases the circumstances revealed that such an obligation was essential to give effect to the contract between the parties and was in accord with their intent. On the other hand, where the parties have considered the matter and deliberately omitted any such obligation, or where it is unnecessary to imply such an obligation in order to give effect to

the terms of their contract, it will not be implied. HML Corp. v. General Foods Corp., 365 F.2d 77 (3d Cir. 1966); Eastern Electric, Inc. v. Seeburg Corp., 310 F.Supp. 1126 (S.D.N.Y.1969), affd., 427 F.2d 23 (2d Cir. 1970); 3 Corbin, Contracts § 564 (1960 ed.).

█ In determining whether the present motion for summary judgment should be granted, we recognize that the record before us must be viewed in a light most favorable to Vacuum and that if it reveals any genuine issue of material facts, the motion must be denied. United States v. Diebold, Inc., 369 U.S. 654, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); Empire Electronics Co. v. United States, 311 F.2d 175 (2d Cir. 1962). Our starting point, of course, must be the terms of the written contract between the parties. Although the Agreement purported to grant an exclusive license to AMF, obligating it to pay royalties to Vacuum, it is readily apparent that Vacuum, unlike the licensors in those cases where an obligation to exploit has been implied, did not depend for its revenue solely upon sales of the licensed devices (Octopus Lifters) by AMF. In the first place according to the terms of the Agreement Vacuum retained the right itself to manufacture and sell up to $300,000 annually of Octopus Lifters within the licensed territory. The significance of this reservation as a factor negating an implied covenant to exploit is apparent from the undisputed fact that up to the date of the Agreement between the parties Vacuum's maximum gross annual income from sales or licensing of the lifting device in the licensed territory (U.S.) was $63,771 received in 1964, of which $47,939 represented income from the sale of a total of eight machines, parts, and services.

Other provisions of the Agreement which militate against implying a covenant to exploit with due diligence are AMF's obligation to pay a minimum royalty of $25,000 per year for the first two years of the contract, Vacuum's right to terminate at the end of the four years if AMF's royalty payments did not

amount by that time to $100,000 a year, and the stipulation that the Agreement constituted "the entire agreement between the parties." (Article IX, ¶ 4). Although the minimum royalty provision, standing alone, might not preclude the finding of an implied obligation to exploit, see Genet v. Delaware & Hudson Canal Co., 136 N.Y. 593, 32 N.E. 1078 (1893); Mechanical Ice Tray Corp. v. General Motors Corp., *supra;* Driver-Harris Co. v. Industrial Furnace Corp., 12 F.Supp. 918 (W.D.N.Y.1935), it did relieve Vacuum of being solely dependent upon AMF's sales efforts; and it assured Vacuum of an amount equal to 10% royalties on at least $250,000 of sales annually, which appears to have been more substantial in relation to the licensed subject matter than the minimum royalties in decisions relied upon by Vacuum. Furthermore, the minimum royalty clause must be considered along with the other express provisions to which we have referred. For instance, the merger or integration clause (Article IX, ¶ 4), by emphasizing that the formal contract, which contained no undertaking by AMF to exploit the device, constituted the "entire" Agreement between the parties, negates the thought that they intended to impose such a duty upon AMF.

We conclude that the foregoing provisions of the Agreement, when considered together and as a whole, preclude us as a matter of law from implying a covenant on the part of AMF to exercise the alleged standard of diligence (whether it be termed "best efforts," "due diligence," or something along these lines) in the exploitation of the patented lifting device. This is not a case where the licensor (Vacuum) depended for its "sole" compensation from the licensed device upon the exclusive agency granted to the licensee (AMF). See, e. g., Wood v. Lucy, Lady Duff-Gordon, *supra.* On the contrary, the licensor, by reserving to itself the right to make very substantial sales annually in the licensed territory and by imposing a very substantial minimum annual royalty had, in lieu of obtaining an express agreement from AMF to exploit, protected itself against the possibility that the AMF might do nothing and suppress the invention. The minimum royalty provision would ordinarily create an incentive on the part of the licensee to exploit the invention. Undoubtedly the parties also anticipated that AMF would do so. However, this assumption does not provide a sufficient basis for implying an obligation not found in the formal Agreement. It is equally true that where a non-exclusive license is granted, the parties usually assume that the licensee will use diligence to exploit the licensed invention; yet *no convenant to do so will be implied.* See, e. g., American Sealcone Corp. v. Sylvan Seal Milk, Inc., 42 F.Supp. 480, 482 (E.D.Pa.1941).

Vacuum contends that an issue of fact is presented for the reason that discussions between the parties and assurances given during the negotiations which led up to the Agreement reveal an intent to impose upon AMF an obligation diligently to exploit the lifting device. In the absence of any claim of ambiguity in the language of the Agreement, or of fraud or of mutual mistake, we doubt that parol evidence of assurances given in the course of negotiations of the integrated contract (which expressly states that it is the "entire" contract and "supersedes all prior agreements and understandings with respect to Licensed Products whether written or oral") would be admissible. Fogelson v. Rackfay Construction Co., 300 N.Y. 334, 90 N.E. 2d 881 (1950). But even when the benefit of the doubt is given to Vacuum, the evidence relied upon by it, instead of providing a basis for implying a covenant to exploit, does just the contrary. In a nutshell it reveals that the parties discussed the matter of AMF's obligation to exploit the device, with Vacuum demanding a "best efforts" clause and AMF refusing to agree to such a provision. Thereupon they negotiated the various provisions designed to protect Vacuum against nonexploitation, e. g., the minimum annual royalty and the

right to cancel if the royalty did not reach $100,000 by the fourth year,[2] which were incorporated in the Agreement. Although AMF may have orally assured Vacuum that it would diligently exploit the invention, the undisputed history makes it clear that after carefully considering the matter the parties deliberately omitted such an obligation from their formal written Agreement, which states that it is the "entire" Agreement and supersedes any earlier understandings.

> "[A] provision should not be found by 'implication' when the testimony convincingly shows that such a provision was intentionally omitted, or that the specific matter involved was intentionally left for further negotiation and agreement." 3 Corbin, Contracts § 564 (1960 ed.).

Having thus failed to obtain from AMF an agreement to use its "best efforts" to exploit the licensed device and accepted a general oral assurance to the effect that AMF would exploit the device diligently—and we must confess that we have some difficulty distinguishing between due diligence and best efforts— it was incumbent upon Vacuum, if it wished to convert the assurance into a binding obligation, to spell out the obligation in the formal written Agreement that embodied their entire understanding and into which they expressly merged all earlier oral understandings.

Against such a background we would not be justified in implying a legal obligation on the part of AMF to exploit the lifting device diligently. To do so would be to make a mockery of the detailed written Agreement reached as the result of skilled legal negotiations.

Accordingly, defendant's motion for summary judgment is granted.

It is so ordered.

2. Creskoff Dep. pp. 44–46:
"Mr. Dowling [Chairman of the Board of Vacuum] brought up this question of best efforts clause and Mr. Correa went through the same situation with him. Then Mr. Dowling said, 'Perhaps another way of measuring effort can be established. Suppose you guarantee a certain minimum amount of business annually' and this is where the question of a million dollars a year business the first year or second year, I have to look at the contract, increasing business came up.

"Mr. Dowling, although not completely happy—I think if it was anybody but Mr. Correa there with Mr. Dowling would have had his way on best efforts. He had confidence in him. I still do. I like Mr. Correa.

Q Let me see if I understand Mr. Dowling's proposal a little better.

"Was Mr. Dowling proposing that unless AMF achieved a certain amount of business within a certain period, the contract would terminate?

A He was proposing that, too, also.

Q In addition to that, what was he proposing?

A He was proposing that immediately a measuring stick be set up as a measure of best efforts and let's see if I can remember what it was.

"MR. HOWELL: Off the record.
(Discussion off the record.)

A Mr. Correa said there was no reason for a best efforts clause as I said before, simply because they were going to use their best efforts and a best efforts clause would be troublesome."