PERMANENCE CORPORATION, a Michigan Corporation, Plaintiff,

v.

KENNAMETAL, INC., a Pennsylvania Corporation, Defendant.

No. 88–1442.

United States District Court, E.D. Michigan, S.D.

May 18, 1989.

Ronald C. Winiemko of Conner, Harbour & Green, P.C., Bloomfield Hills, Mich. (Armand Kunz, Golden & Kunz, Southfield, Mich., of counsel), for plaintiff.

Ernie Brooks, Mark Cantor and Christopher Fildes, Southfield, Mich., for defendant.

## MEMORANDUM OPINION

RALPH M. FREEMAN, District Judge.

Before the court is defendant's motion for summary judgment pursuant to Federal Rule of Civil Procedure 56(c). In this diversity action, plaintiff seeks damages for the breach of an implied obligation of a licensing agreement. Plaintiff's complaint includes the following averments:

4. On the 8th day of February, 1979, the parties hereto did enter into a written agreement, ..., whereby plaintiff PERMANENCE did assign to defendant KENNAMETAL the non-exclusive rights to manufacture and sell products made from, and pursuant to, certain patents as described in said agreement, to-wit: patent numbers 4,024,902, 4,140, 170, and 4,146,080, said assignment being for a valuable consideration.

5. Plaintiff Permanence did also assign to defendant Kennametal, by means of the same agreement, any and all improvements to the technology covered by the aforementioned patents, as well as any and all further inventions related thereto, either of which might be developed by Permanence or by its president, Charles S. Baum.

6. Thereafter, on February 5, 1981, defendant KENNAMETAL INC. did exercise its option, as set forth in the written agreement between the parties, and obtained the exclusive rights to manufacture and sell products under and pursuant to the patents licensed by plaintiff to defendant, as previously set forth herein.

7. Defendant KENNAMETAL INC. did bind itself contractually, upon exercise of its option as set forth above, *to exercise its best efforts to manufacture and sell products* pursuant to the patents which plaintiff had exclusively assigned to it.

8. Defendant KENNAMETAL INC. has breached and continues to breach to date, its obligations under the aforementioned written agreement be-

tween the parties [to exercise its best efforts].... (emphasis added). It is this "best efforts" clause upon which defendant bases its summary judgment motion. Defendant argues that "[a] best efforts clause will not be implied in a patent license agreement where (i) the agreement is adequately supported by consideration, (ii) the plaintiff was represented by counsel, and (iii) the agreement is expressly an integrated agreement. *Permanence Corporation v. Masco Corporation,* Michigan Court of Appeals Case No. 65585 (October 4, 1983)." Plaintiff, relying upon the seminal case of *Wood v. Lucy, Lady Duff–Gordon,* 222 N.Y. 88, 118 N.E. 214 (1917) (Cardozo, J.), and its progeny, argues that this contract for defendant's exclusive use of plaintiff's patents contains an implied obligation that defendant will use its best efforts to exploit the patents.

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." "A fact is 'material' and precludes grant of summary judgment if proof of that fact would have [the] effect of establishing or refuting one of the essential elements of the cause of action or defense asserted by the parties, and would necessarily affect application of appropriate principle of law to the rights and obligations of the parties. [citation omitted]." *Kendall v. Hoover Co.,* 751 F.2d 171, 174 (6th Cir. 1984) (quoting Black's Law Dictionary 881 (6th ed. 1979)). The court must view the evidence in a light most favorable to the nonmovant as well as draw all reasonable inferences in the nonmovant's favor. *See United States v. Diebold, Inc.,* 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962); *Bender v. Southland Corp.,* 749 F.2d 1205, 1210–11 (6th Cir.1984).

The movant bears the burden of demonstrating the absence of all genuine issues of material fact. *See Gregg v. Allen–Bradley Co.,* 801 F.2d 859, 861 (6th Cir. 1986). The initial burden on the movant is not as formidable as some decisions have indicated. The moving party need not produce evidence showing the absence of a genuine issue of material fact; rather, "the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). Once the moving party discharges that burden, the burden shifts to the nonmoving party to set forth specific facts showing a genuine triable issue. F.R. Civ.P. 56(e); *Gregg,* 801 F.2d at 861.

To create a genuine issue of material fact, however, the nonmovant must do more than present some evidence on a disputed issue. As the United States Supreme Court stated in *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986),

> there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the [nonmovant's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted.

*Id.* at 249–50, 106 S.Ct. at 2510–11 (citations omitted); *see Catrett,* 477 U.S. at 322–23, 106 S.Ct. at 2552–53; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986). The standard for summary judgment mirrors the standard for a directed verdict under Federal Rule of Civil Procedure 50(a). *Anderson,* 477 U.S. at 250, 106 S.Ct. at 2511. Consequently, a nonmovant must do more than raise some doubt as to the existence of a fact; the nonmovant must produce evidence that would be sufficient to require submission to the jury of the dispute over the fact.

In *Vacuum Concrete Corp v. American Machine & Foundry Co.,* 321 F.Supp. 771, 772–73 (S.D.N.Y.1971), the court adequately summarized the competing interests in

determining whether to infer[1] an obligation of best efforts:

■ It is settled law that the court will imply a duty on the part of an exclusive licensee to exploit the subject matter of the license with due diligence, where such a covenant is essential as a matter of equity to give meaning and effect to the contract as a whole. *Wood v. Lucy, Lady Duff-Gordon,* 222 N.Y. 88, 118 N.E. 214 (1917); *Mechanical Ice Tray Corp. v. General Motors Corp.,* 144 F.2d 720 (2d Cir.1944), cert. denied sub nom. *Horton v. General Motors Corp.,* 324 U.S. 844, 65 S.Ct. 679, 89 L.Ed. 1406 (1945); *Guardino Tank Processing Corp. v. Olsson,* 89 N.Y.S.2d 691 (Sup.Ct. N.Y.Co.1949). The reasoning of these decisions is that it would be unfair to place the productiveness of the licensed property solely within the control of the licensee, thereby putting the licensor at his mercy, without imposing an obligation to exploit upon the licensee. In effect the court is merely enforcing an obligation which the parties overlooked expressing in their contract or which they considered unnecessary to be expressed. In such circumstances the implied obligation "must conform to what the court may assume would have been the agreement of the parties, if the situation had been anticipated and provided for. (Addison on Contracts, 22) Thus whatever obligation is sought to be raised by legal implication, must be of such a character as the court will assume would have been made by the parties if their attention had been called to the subject, and their conduct inspired by principles of justice. *Dermott v. State of New York,* 99 N.Y. 101, 109, 1 N.E. 242 (1885)."

■ A typical example of an implied covenant to exploit is found in a leading case in New York on the subject. *Wood v. Lucy, Lady Duff-Gordon, supra.* There the defendant, a fashion designer, gave the plaintiff the exclusive privilege of marketing defendant's design. Although the plaintiff did not expressly agree to exploit the design, the court implied such an obligation, since defendant's sole revenue was to be derived from plaintiff's sales of clothes designed by defendant and defendant was thus at the plaintiff's mercy. In this and in similar cases the circumstances revealed that such an obligation was essential to give effect to the contract between the parties and was in accord with their intent. On the other hand, where the parties have considered the matter and deliberately omitted any such obligation, or where it is unnecessary to imply such an obligation in order to give effect to the terms of their contract, it will not be implied. *HML Corp. v. General Foods Corp.,* 365 F.2d 77 (3d Cir.1966); *Eastern Electric, Inc. v. Seeburg Corp.,* 310 F.Supp. 1126 (S.D.N.Y.1969), affd., 427 F.2d 23 (2d Cir.1970); 3 Corbin, Contracts § 564 (1960 ed.).

■ In determining whether the present motion for summary judgment should be granted, we recognize that the record before us must be viewed in a light most favorable to Vacuum and that if it reveals any genuine issue of material facts, the motion must be denied. *United States v. Diebold, Inc.,* 369 U.S. 654, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *Empire Electronics Co. v. United States,* 311 F.2d 175 (2d Cir.1962). Our starting point, of course, must be the terms of the written contract between the parties. Although the Agreement purported to grant an exclusive license to AMF, obligating it to pay royalties to Vacuum, it is readily apparent that Vacuum, unlike the licensors in those cases where an obligation to exploit has been implied, did not depend for its revenue

---

1. As a grammatical aside, many courts and litigants refer to courts *implying* an obligation of best efforts after a review of the contractual language. The correct grammatical construction of the best efforts issue is: Did the *parties imply* a best efforts requirement in their contract; should the *court infer* a meaning in their implication? *See* Barnet & Stubbs's, *Practical Guide to Writing* 401 (3rd ed. 1980) ("The writer or speaker *implies* (suggests); the perceiver *infers* (draws a conclusion) ... Although *infer* is widely used for *imply,* preserve the distinction.").

solely upon sales of the licensed devices (Octopus Lifters) by AMF. In the first place according to the terms of the Agreement Vacuum retained the right itself to manufacture and sell up to $300,000 annually of Octopus Lifters within the licensed territory. The significance of this reservation as a factor negating an implied covenant to exploit is apparent from the undisputed fact that up to the date of the Agreement between the parties Vacuum's maximum gross annual income from sales or licensing of the lifting device in the licensed territory (U.S.) was $63,771 received in 1964, of which $47,939 represented income from the sale of a total of eight machines, parts, and services.

The decision in each case in which a party asserts an implied obligation of best efforts turns upon the circumstances of each case, although certain factors can be distilled from an evaluation of the reported cases. In the *Wood* case, for example, the most important factor in the decision was that the fashion designer would not receive any revenue unless the plaintiff sold the designer's clothes. As a matter of equity, Justice Cardozo held that the contract was "instinct with obligation" on the plaintiff to use reasonable efforts to sell the clothes.

In *Havel v. Kelsey–Hayes Co.*, 83 A.D.2d 380, 445 N.Y.S.2d 333 (1981), the agreement in issue provided as follows:

> By agreement dated January 30, 1973, plaintiff granted to defendant an exclusive license for the use and dissemination of the patented process. Defendant agreed to pay plaintiff a percentage of the cost of super alloy powders used in the process and further agreed that plaintiff would receive 25% of all lump sum payments and 40% of all royalties paid to defendant by sublicensees. The agreement also provided for payment by defendant of minimum royalties of $20,-000 per year. The minimum payment was not guaranteed, however, because plaintiff's sole right was to terminate the license on defendant's failure to make up the deficiency if plaintiff's share of the lump sum payments and royalties did not amount to $20,000 in any calendar year.

*Id.* 445 N.Y.S.2d at 334. The court held that the contract, when read as a whole, was instinct with an obligation to use reasonable efforts to exploit the process. *Id.* at 336. Of primary importance to the court was the provision for an exclusive license; of further importance was that the minimum royalty provision was not guaranteed and that public policy supports the use of patents, not their suppression.

In *Willis Bros., Inc. v. Ocean Scallops, Inc.*, 356 F.Supp. 1151 (E.D.N.C.1972), the license agreement granted to the defendant,

> an exclusive, world wide right for the life of the patent to manufacture, use and sell a certain scallop shucking process on which plaintiffs had pending an application for letters patent. The plaintiffs agreed not to manufacture, use, or sell the equipment except as to commitments made prior to the agreement. In consideration for this exclusive licensing, the defendant agreed to pay plaintiffs an amount determined on a basis of three cents per net pound of product processed by use of the equipment and/or the processes. There is no minimum royalty provision in the contract. Although the Agency Agreement provides that Willis Brothers will serve as a non-exclusive agent for the defendant in the sale of scallop meat, there is no reservation of rights in the License Agreement permitting the plaintiffs to compete with the license. The Employment Contract provided that Willis was to receive consultant's fees. This agreement was cancelled by the defendant after one year. In order to enable the plaintiffs to pay the debts incurred by the development of the patent, the defendant loaned Willis Brothers seventy thousand dollars. Prepayment of the loan was to be made by application to the principal the royalties under the License Agreement and percentages of the amount payable to Willis Brothers under the Agency Agreement. The prepayment provision providing for payment of the loan from the royalties indicates that a "best efforts" provision

is essential to give effect to the agreements between the parties.

*Id.* at 1156. Of importance to the court was that the agreement was for an exclusive license to work the patent and that the defendant must use due diligence in working the patent to allow plaintiff to repay the loan defendant made to it as part of the agreement.

In *Bellows v. E.R. Squibb & Sons, Inc.,* 184 U.S.P.Q. 473 (N.D.Ill.1974), the agreement in issue provided in pertinent part:

4.01 Concurrently with the execution of this Agreement [Squibb] shall pay to [Bellows] the sum of ... ($50,000.00), which shall represent a credit against future royalties, but shall not be refundable in whole or part in the event no royalties acrue [sic] to Bellows.

8.02 [Squibb] may terminate this Agreement in its entirety ... by giving [Bellows] written notice at least six (6) months prior to such termination.

8.03 In the event of any of the following, [Bellows] may, at his option, terminate this Agreement:

a) [Squibb] elects not to exploit the license granted hereunder, ... and [Squibb] shall have so notified [Bellows].

. . . . .

d) [Squibb] ... has failed to market the Licensed Product ... within eighteen (18) months of the date of this Agreement.

e) [Squibb] does not pay to [Bellows] a minimum royalty of ... ($50,000) for each year after 1974 and during the life of this Agreement.

*Id.* at 474. The court held as a matter of law that there could be no implied duty of best efforts in the exploitation of the invention. The crucial factors in the case are that the agreement specifically recognized that Squibb might decide not to exploit the patent and provided for that contingency. The court also noted that the agreement was the result of arm's length bargaining with both parties assisted by counsel and that "[n]o obligation should be implied to merely cure an unsatisfactory bargain." *Id.*

Looking at the agreement in this case, the court notes several important factors. First, the defendant exercised its option to obtain the exclusive rights to exploit plaintiff's patents. As the court stated in *Bellows*:

"In the *Wood* case, supra, the emphasis of the decision of the New York Court of Appeals was placed on the exclusive agency taken by the plaintiff, as a clear indication of the obligation of the plaintiff to perform. Exclusivity is a paramount feature of the agreements *sub judice,* and coupled with the other terms of the agreement involved herein demands application of the rule of correlative obligation." [citation omitted]

*Bellows v. E.R. Squibb & Sons, Inc.,* 359 F.Supp. 204, 205–06 (N.D.Ill.1973). Plaintiff had no right to exploit or use its patents because it put that right and obligation in the hands of the defendant. This exclusive license factor bodes well for plaintiff.

Second, plaintiff could only terminate the agreement upon a breach of the agreement by defendant; defendant, however, could terminate the agreement upon 90 days notice provided that it pay the royalties due up to the effective date of the cancellation. Unlike *Bellows,* this agreement does not contain any provision allowing plaintiff to terminate the agreement if best efforts were not used or if certain minimum royalties were not paid. This factor further supports plaintiff's position.

Third, the agreement contained an integration clause:

This Agreement supersedes all other agreements, oral or written, heretofore made with respect to the subject matter hereof and the transactions contemplated hereby and contains the entire agreement of the parties.

*See* ¶ 10.4. Defendant relies upon this provision in arguing against any implied obligation of best efforts. In *Vacuum Concrete Corp.,* 321 F.Supp. at 773–74, the court stated:

Other provisions of the Agreement which militate against implying a covenant to exploit with due diligence are ...

the stipulation that the Agreement constituted "the entire agreement between the parties." ... For instance, the merger or integration clause ..., by emphasizing that the formal contract, which contained no undertaking by AMF to exploit the device, constituted the "entire" Agreement between the parties, negates the thought that they intended to impose such a duty upon AMF.

See also *HML Corp. v. General Foods Corp.*, 365 F.2d 77, 82 (3rd Cir.1966) (contract contained explicit statement that it incorporated entire agreement of parties); *Permanence Corp. v. Masco Corp.*, No. 65585, slip op. at 4 ("This contract is an express integrated agreement."). In *Havel,* however, the court stated:

Nor does the "ENTIRE UNDER-STANDING" clause of the contract bear upon the issue [of best efforts]. It provides:

"This Agreement constitutes the entire understanding between the parties and it is specifically understood that there are no other warranties, covenants or agreements, expressed or implied, between the parties, or any understanding other than those expressly set forth herein."

The salutory purpose of that language is to preclude consideration of matters extrinsic to the agreement. It is of no relevance if the promise, albeit imperfectly expressed, is implicit in the contract as written.

Fourth, the parties have submitted contradictory affidavits regarding the drafting of the agreement and what was negotiated. *See* McKenna Affidavit ¶ 9 ("Kennametal responded in a letter dated March 11, 1985, pointing out that Permanence and Kennametal had discussed 'best efforts' during the negotiation and that the parties had agreed to prepaid royalties instead...."); Krass Affidavit ¶ 4 ("Neither the completed agreement nor any of the draft agreements contained a 'best efforts' clause and, to the best of my knowledge, there were not negotiations with respect to the inclusion of such a clause.").

Fifth, on February 8, 1979, defendant pursuant to the agreement paid to plaintiff $250,000, $100,000 of which was an advance payment of royalties. On February 5, 1981, defendant paid plaintiff a second up-front fee of $250,000, $100,000 of which was an advance payment of royalties. The agreement also contained royalty rates on the net sales price of products made by defendant using processes that fall under valid claims of the patents. This factor sways decidedly in defendant's favor.

Finally, there is no dispute that the agreement has no express reference to "best efforts" with regard to the use of the patent, although the court notes that in another portion of the agreement the parties agreed that "Kennametal shall use *reasonable efforts* to guard against the unauthorized use or disclosure of such technology and technical assistance." *See* ¶ 6.4 (emphasis added). The inclusion of the phrase "reasonable efforts" in paragraph 6.4 and the absence of that phrase in any other section of the agreement militates against inferring an implied promise to use best efforts to exploit the patents. This agreement was negotiated at arm's length by competent counsel.

After considering these factors, the court holds that there is no implied obligation of best efforts. Of primary importance is that the defendant paid up-front over $500,-000 in fees and advance royalties. Thus, unlike the seminal *Wood* case, plaintiff's sole revenue was not subject to the whim of defendant in exploiting the patents—plaintiff had money in hand and was to receive further royalties under the agreement. While the *Masco* case upon which defendant relies can be distinguished because it involved a nonexclusive license, the Michigan Court of Appeals in that case stated:

There is no showing by the parties that Masco Corporation ordinarily supplied best effort clauses to licensing agreements. The circumstances surrounding this agreement also do not support the contention that the best efforts clause was so clearly within the contemplation of the parties that they deemed it unnecessary to expressly stipulate it. The record discloses a dispute between the

parties as to whether a best efforts clause was considered during negotiation of this agreement. This is not a dispute of fact which would preclude summary judgment.

This dispute shows that the parties did not feel that a best efforts clause was so clearly implied that it was unnecessary to include it in the contract.....[2]

*Masco*, slip op. at 4. Similarly, in the instant case, the only disputed factual issue is what occurred during the negotiation of the agreement. The court has carefully read the agreement and holds that no best efforts clause can be implied to it.[3] Defendant shall submit an appropriate order approved as to form.

**2.** The court points out that Pennsylvania law is to govern the agreement. *See* ¶ 10.5. Neither party has argued on whether this court, sitting in diversity, should recognize this provision or whether there is any relevant conflict in this area of the law between Michigan and Pennsylvania. *See Boatland, Inc. v. Brunswick Corp.,* 558 F.2d 818, 821 (6th Cir.1977) (state substantive law binds federal court, including conflict of laws of forum in which court sits); 15 Wayne L.Rev. at 162 (Michigan cases have upheld choice of law clauses). The court assumes there is no significant difference between the two states on implied best efforts clauses.

**3.** The court is aware that the plaintiff recently filed a motion for leave to amend complaint. The court will entertain that motion even though it is granting defendant's motion. The parties will receive a notice of hearing shortly.