**TRECOM BUSINESS SYSTEMS, INC., Plaintiff,**

v.

**Nallur PRASAD, Defendant.**

**Civ. No. 96–1919(WHW).**

United States District Court,
D. New Jersey.

Oct. 6, 1997.

Joseph L. Buckley, Kathleen Gengaro, Sills, Cummis, Zuckerman, Radin, Tishman, Epstein & Gross, Newark, NJ, for Plaintiff.

Jodie Lee Alper, Lasser, Hochman, Marcus, Guryan & Kluskin, Roseland, NJ, Wm. Lee Kinnally, Jr., Gibney, Anthony & Flaherty, New York, NY, for Defendant.

## OPINION

WALLS, District Judge.

Complaint was filed by Trecom Business Systems, Inc., now known as DMR Trecom, Inc., ("Trecom") against defendant, Nallur Prasad ("Prasad"), a former employee, for damages sustained as a result of the alleged breach of an agreement wherein Trecom purchased the rights, title, and interest to computer software developed by Prasad. Defendant has filed a Counterclaim alleging that Trecom breached this agreement by failing to adequately modify, enhance, and market the software, essentially rendering it obsolete and unprofitable.

Currently before the Court is Trecom's motion for summary judgment dismissing the Counterclaim pursuant to Rule 56(b) of the Federal Rules of Civil Procedure. Pursuant to Rule 78 of the Federal Rules, the Court decides this motion without oral argument. For the following reasons, this Court grants Trecom's motion for summary judgment.

## I. *FACTUAL BACKGROUND*

Trecom is a Delaware corporation in the business of, among other things, providing computer consulting services. Prasad is a New York resident who works as a computer consultant and software developer. The Court has jurisdiction over this controversy under 28 U.S.C. § 1332.

In the Summer of 1990, Richard Hourihan, then Vice President of Trecom's Management Science Group, contacted Prasad to discuss whether he was interested in joining Trecom as a senior manager for the science management group. At that time, Prasad was employed as a consultant with the Berylesmann Music Group in Lyndhurst, New Jersey. Prasad had been working for the past two years on developing a set of computer programs known as GURU ("GURU" or "the software"). The function of GURU was the optimization (also known as "tuning for performance") of computer programs which run on the International Business Corporation ("IBM") mainframe and access data using DB2, IBM's major database management system.

During the course of their conversations, Prasad referred to GURU and its functions. The parties dispute the content of these discussions. Trecom asserts that Prasad represented that there was a substantial market for GURU, that the product was state of art, that further development and marketing of the software would be profitable to Trecom, and that IBM United Kingdom Limited ("IBM UK") and others intended to purchase licenses for GURU. *See* Compl. ¶ 6; Hourihan Dep. at 35–39. Prasad disputes that he ever specifically stated that the software was "state of the art" or that IBM UK had already definitively decided to purchase GURU. In any event, Mr. Prasad accepted the job and began working at Trecom in October 1990.

During the following months, Prasad continued to discuss GURU and its potential marketability with Mr. Hourihan and other executives at Trecom. In April 1991, the parties entered into a contract ("Agreement") providing that Prasad would convey his rights, title, and interest in GURU to Trecom in consideration for $100 up-front and future royalty payments calculated in accordance with the provisions of the Agreement. *See* GURU Agreement annexed to Compl. The Agreement stated that Prasad would receive fifteen percent of all future sales of the software up to a maximum of $6,000,000. *See id.* ¶ 3(a). The Agreement required Prasad to render technical assistance with respect to efforts to enhance, modify, or add to the software if Trecom so requested. *See id.* ¶ 5(a). At issue in this motion is a prefatory "Whereas" clause in the Agreement that provides: "WHEREAS, Trecom intends to modify and enhance the

Software, and further make derivative works therefrom[.]"

Trecom, in collaboration with Prasad, proceeded to attempt to improve, develop, and market the software. Trecom established committees and a special GURU Project Team to plan the marketing strategy for GURU. There were monthly meetings that Prasad regularly attended. *See* Minutes of Products Development Steering Committee, Exh. G(1)-(6) annexed to Kathleen Gengaro Certification ("Gengaro Cert."). The committee planned marketing and sales strategies, proposed technical improvements to the software, performed a competitive analysis, and prepared and implemented strategic plans of action. *See* Gengaro Cert., Exh. G(1)-(7), (11), (12). Trecom established the Products Division to market GURU and two of Trecom's own internally developed products. See Nallur Prasad Certification ("Prasad Cert.") ¶ 15. Trecom created a Product Marketing Plan, Product Brief, and a manual for GURU. *See* Gengaro Cert., Exh. G(8), G(9); Def.'s Response to Admission No. 40. Trecom also replatformed GURU from a mainframe version to a version that could run on a PC. This required approximately six months of work by Abe Salzman, a technical specialist at Trecom. *See* Prasad Dep. at 114–17. Prasad does not dispute that Trecom made the above efforts to market, develop, and improve the software. Trecom contends that it expended hundreds of thousands of dollars and devoted substantial resources and experienced personnel to this project.

In order to increase exposure of the software, Trecom exhibited GURU at an international trade conference in New York. In addition, personnel at Trecom contacted third party vendors to pursue potential sales or licensing agreements for the software. The vendors included Allen Systems, Relational Data Services, Programmart Corporation, and Landmark Systems. *See* Prasad Dep. at 195–96, 209–10, 249, 257–58. Trecom failed to enter into any deal with these prospective vendors. According to Trecom, it did not finalize any negotiations with these companies because they were unwilling to pay any money up-front and because they refused to agree to indemnify Trecom should any user sue based upon a defect in the program. *See* Hourihan Dep. at 143–48, 173–77. The plaintiff refers to a provision in the Agreement granting it the "sole, absolute and unconditional right to establish ... the terms, conditions, prices, rates, and payments to be made under any License" to support its argument that it was totally within its discretion to determine whether to enter such deals.

Despite Trecom's efforts during the following eighteen or so months, it only realized one sale of GURU. NYNEX purchased two PC GURU licenses for $100,000; Trecom promptly provided the appropriate royalty payment due to Prasad for this sale. IBM (USA), which had originally requested that a PC version of GURU be developed, and IBM UK withdrew their interest in the software. In late 1992 or early 1993, Trecom concluded that the project was doomed to failure and made a business decision to abandon its efforts to market and further develop the software. Prasad admits that at that time Trecom offered him back the rights and title to GURU although it is disputed whether such a conveyance was ever formally executed. *See* Prasad Dep. at 142. Prasad asserts that at that time he asked Trecom for financial assistance to allow him to make GURU compatible with the recent upgraded versions of DB2 but that this request was denied. *See* Prasad Cert. ¶ 26.

Prasad continued to work for Trecom for close to three more years until his employment was terminated by the company in November 1995. In January 1996, Prasad's attorney for the first time contacted Trecom threatening to bring suit for breach of contract if Trecom failed to pay him a substantial sum of money. *See* Gengaro Cert., Exh. K. Trecom responded by filing the present action against Prasad in state court seeking damages for the alleged misrepresentation that Prasad made concerning the marketability and development of GURU and for Prasad's purported failure to render adequate assistance in the company's effort to produce a marketable version of the program. Trecom also seeks a declaratory judgment that it satisfied its obligations under the Agreement. Prasad responded by removing the case to

this Court and by filing a Counterclaim seeking damages in excess of $6 million for Trecom's alleged breach of the Agreement. Prasad asserts that Trecom breached the Agreement by failing to modify and enhance GURU as stated in the "Whereas" clause, by failing to market GURU, and by not availing itself of numerous opportunities to sell the software to interested customers. *See* Counterclaim ¶ 58. Prasad specifically refers to Trecom's failure to update GURU to make it compatible with the more recent upgraded versions of DB2 and its decisions not to enter into agreements with certain third-party vendors who had expressed interest in marketing or licensing the program. *See* Prasad Cert. 21–24. Trecom has now moved this Court to grant summary judgment dismissing this Counterclaim.

## II. *STANDARD FOR SUMMARY JUDGMENT*

Summary judgment is appropriate where the moving party establishes that "there is no genuine issue of material fact and that [it] is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The moving party must show that if the evidentiary material of record were reduced to admissible evidence in court, it would be insufficient to permit the non-moving party to carry its burden of proof *Celotex v. Catrett,* 477 U.S. 317, 318, 106 S.Ct. 2548, 2550, 91 L.Ed.2d 265 (1986).

Once the moving party has carried its burden under Rule 56, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts in question." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The opposing party must set forth specific facts showing a genuine issue for trial and may not rest upon the mere allegations or denials of its pleadings. *Sound Ship Building Corp. v. Bethlehem Steel Co.,* 533 F.2d 96, 99 (3d Cir.1976), *cert. denied,* 429 U.S. 860, 97 S.Ct. 161, 50 L.Ed.2d 137 (1976).

At the summary judgment stage the court's function is not to weigh the evidence and determine the truth of the matter, but rather to determine whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986). In doing so, the court must construe the facts and inferences in the light most favorable to the non-moving party.

## III. *ANALYSIS*

The Agreement directed that New York law would govern any dispute arising from the contract. *See* GURU Agreement ¶ 12(a). Thus, this Court will apply New York case law to determine the rights and obligations of each party under the Agreement.

### A. *Whether Trecom Breached the "Whereas" Clause*

■ In his counterclaim, Prasad alleges that Trecom breached the Agreement by failing to comply with the clause that stated: "WHEREAS, Trecom intends to modify and enhance the Software, and further make derivative works therefrom[.]" A recital of intent in a "whereas" clause cannot create any right beyond those established by the operative terms of the contract. *See Abraham Zion Corp. v. Lebow,* 761 F.2d 93, 103 (2d Cir.1985); *Genovese Drug Stores, Inc. v. Connecticut Packing Co.,* 732 F.2d 286, 291 (2d Cir.1984). The Second Circuit has addressed the effect of such language in a "whereas" clause and has found that "an expression of intent in a 'whereas' clause of an agreement between two parties may be useful as an aid in construing the rights and obligations created by the agreement, but it cannot create any right beyond those arising from the operative terms of the document." *Genovese Drug Stores,* 732 F.2d 286 at 291. The Agreement here does not contain any other language imposing a duty on Trecom to "modify and enhance" GURU. In addition, Prasad does not refer to any ambiguities in the Agreement requiring clarification by reference to the "whereas" clause. Although Trecom did express its general intention to "modify and enhance" GURU in the "whereas" clause, such a recital alone cannot create a contractual obligation. Thus, the express terms of the contract did not require Trecom to modify, enhance, develop, or market the software.

### B. *Whether Trecom Breached Its Implied Duties Under the Agreement*

■ Although there is no express provision requiring Trecom to improve, develop, or market GURU, Trecom had an implied duty to make a good faith and reasonably diligent[1] effort to perfect and market the software. Courts have implied such a duty in the context of exclusive licensing agreements and assignments of patent rights. *See, e.g., Mechanical Ice Tray Corp. v. General Motors Corp.,* 144 F.2d 720 (2d Cir. 1944), *cert. denied,* 324 U.S. 844, 65 S.Ct. 679, 89 L.Ed. 1406 (1945); *Perma Research & Dev. Co. v. Singer Co.,* 402 F.Supp. 881 (S.D.N.Y.1975), aff'd, 542 F.2d 111 (2d Cir. 1976); *Vacuum Concrete Corp. of America v. American Mach. & Foundry Co.,* 321 F.Supp. 771 (S.D.N.Y.1971). "It is well-settled under New York law that where ongoing commissions or royalties are to be paid in an exclusive arrangement, a court will imply a covenant on the part of an exclusive licensee/assignee to exploit the subject matter of the license/assignment with due diligence 'where such a covenant is essential as a matter of equity to give meaning and effect to the contract as a whole.'" *G. Golden Assocs. of Oceanside, Inc. v. Arnold Foods Co.,* 870 F.Supp. 472, 476 (E.D.N.Y.1994) (quoting *Vacuum Concrete,* 321 F.Supp. at 772) (implying such a covenant in a contract which assigned rights to the trademark and technology relating to the production of a flat bread product in exchange for future commissions on sales). Such a covenant is implied in "a wide variety of contracts in which consideration for a grant of property lies wholly in the payment of 'sums of money based upon the earnings of property transferred.'" *Mechanical Ice Tray Corp.,* 144 F.2d at 725 (quoting *In re Waterson, Berlin & Snyder Co.,* 48 F.2d 704, 709 (2d Cir. 1931)).

It is necessary to imply this duty because the extent of the consideration received by the assignor in the form of royalty income is wholly dependent on the efforts of the assignee to exploit, develop, and market the product. *See id.* Fairness and equity require this Court to impose this implied duty in order to ensure that there is mutuality of obligation and that the assignee receives the benefit of his bargain. "[I]t would be unfair to place the productiveness of the licensed [assigned] property solely within the control of the licensee [assignee], thereby putting the licensor [assignor] at his mercy, without imposing an obligation to exploit upon the licensee [assignee]." *Vacuum Concrete Corp.,* 321 F.Supp. at 773.

The rationale for this implied covenant was set forth in the famous New York case, *Wood v. Lucy, Lady Duff–Gordon,* 222 N.Y. 88, 118 N.E. 214 (1917). There, the defendant, a fashion designer, granted to the plaintiff the exclusive right to market the defendant's design in exchange for a certain percentage of the profits from sales. Although the contract did not explicitly require the plaintiff to do anything, the court found that the plaintiff had an implied obligation to exercise reasonable efforts to market the designs. The court reasoned that such an implied obligation was necessary to promote equity since the defendant's sole source of consideration was based on a proportion of future sales. The implied covenant prevented one party

---

1. Prasad contends that Trecom had a duty to use its "best efforts" to perfect and market GURU while Trecom argues that it was only required to use "reasonable" efforts. Courts appear to vary in which terminology they prefer to use when setting forth this standard. *See Permanence Corp. v. Kennametal, Inc.,* 908 F.2d 98, 100 n. 2 (6th Cir.1990) (referring to obligation to make "best efforts" but noting that "[a] more accurate description of the obligation owed would be the exercise of 'due diligence' or 'reasonable efforts'"); *G. Golden Assocs. of Oceanside v. Arnold Foods Co.,* 870 F.Supp. 472, 476 (E.D.N.Y. 1994) (requiring "due diligence"); *Perma Research & Dev. Co. v. Singer Co.,* 402 F.Supp. 881, 896 (S.D.N.Y.1975), *aff'd,* 542 F.2d 111 (2d Cir. 1976) (using "best efforts" standard); *Vacuum Concrete Corp. of America v. American Mach. & Foundry Co.,* 321 F.Supp. 771, 775 (S.D.N.Y. 1971) (noting that it is difficult to distinguish between "due diligence" and "best efforts" standard); *Wood v. Lucy, Lady Duff–Gordon,* 222 N.Y. 88, 90, 118 N.E. 214 (1917) (referring to obligation to use "reasonable efforts"). This Court chooses to follow the approach used in *G. Golden Associates* and imposes on Trecom an implied duty to act in good faith and with due diligence in developing and marketing the software. The Court, however, views this as merely an issue of semantics and notes that its decision would not differ if it adopted the "best efforts" terminology.

from being "placed at the mercy of the other." *Id.* at 91, 118 N.E. 214.

In *Vacuum Concrete Corporation,* the court refused to imply a duty to make diligent and good faith efforts to exploit a licensed device even though it recognized that under certain circumstances such an obligation did exist. The court in that case emphasized that the licensor did not depend solely upon royalties from future sales of the licensed product for its revenue. Instead, the licensing agreement there provided that the licensor retained the right to produce the device and directly sell it up to an annual value of $300,000, guaranteed the licensor a minimum royalty of $25,000 per year for the first two years, and granted the licensor the right to terminate the licensing agreement if after four years the royalty payments did not amount to $100,000 per year. The court found that these provisions relieved the licensor from "being solely dependent" upon the licensee's sales efforts to receive any consideration for the license. *Vacuum Concrete Corp.,* 321 F.Supp. at 774. Here, however, these circumstances do not exist. Prasad did not retain any rights to the software and was not guaranteed any minimum royalty payment. He was only granted a percentage of future sales and an advance payment of $100.[2] Thus, aside from the $100, the amount of consideration that he received for his invention was solely dependent on royalties and Trecom's ability to sell the product.

Trecom was required not only to act in good faith and with due diligence in marketing GURU, but also had an implied obligation to make reasonable efforts to perfect or enhance the software. In this respect, this case is quite similar to *Perma Research & Development.* There, Perma assigned its patent for an anti-skid device to Singer in exchange for an agreement by Singer to pay Perma royalties for each device marketed. Their contract was silent as to Singer's obligations to market or perfect the device.

However, the court found that Singer had an implied duty to employ its best efforts to both market the device and to provide the technical assistance necessary to perfect it. The court emphasized that the agreement between the parties included a technical services contract that required Perma to collaborate with Singer in any engineering modifications that Singer required the inventor to do to make the product more marketable. This agreement, the court noted, demonstrated that Singer realized that the patent needed further development before it would be ready for the marketplace. Because of this understanding, it was fair to impose an obligation upon Singer to devote a reasonable amount of time and energy to developing and improving the device, even though the contract did not explicitly spell out this duty. The court recognized that Perma had reasonably expected that such efforts would be made when it entered into the agreement. Here the Agreement includes a similar provision which obligated Prasad to assist Trecom in any efforts to modify and enhance GURU. *See* GURU Agreement ¶ 5(a). Thus, it is reasonable to presume that Prasad expected Trecom to devote energy and resources to further develop and perfect the software. Trecom had an implied duty to do so to a certain extent.

■ Having found that Trecom did indeed have an implied duty to make a good faith and reasonably diligent effort to develop, enhance, and market GURU, the issue is whether Trecom has fulfilled this obligation. The Court acknowledges that whether a party has acted in good faith is generally a question to be answered by the trier of fact and not in a motion for summary judgment. *See G. Golden Assocs.,* 870 F.Supp. at 478. However, where there is uncontroverted evidence which shows that the moving party exerted considerable effort and expense to enhance and market the product and the non-moving party fails to refer to any specif-

---

**2.** The $100 advance payment cannot be considered sufficient consideration to persuade this Court not to impose a duty on Trecom to act in good faith with due diligence to develop and market the software. This is a minimal amount and does not constitute the type of "substantial up-front or advance royalty payment" necessary to preclude a court from implying such a covenant. *Permanence Corp. v. Kennametal, Inc.,* 908 F.2d 98 (6th Cir.1990) (refusing to impose on licensee an implied obligation to use best efforts to exploit a patent where the licensor received an advance of $250,000).

ic contractual language, conduct, or circumstances suggesting that the assignee should have done more than it did, summary judgment may be granted. Such is the case here.

■ Prasad has not submitted any evidence to contradict Trecom's assertion that it devoted extensive time, resources, and personnel to further develop and market GURU. It is undisputed that Trecom established a special GURU Project Team which regularly met to plan marketing strategies for GURU, to perform a competitive analysis, to proposed technical improvements for the software, and to prepare and implement strategic plans of action. Prasad himself was a member of this team and attended these monthly meetings. Furthermore, Prasad does not dispute that Trecom successfully created a PC version of the software, a complex project that took over six months to complete, in the hope that this would make GURU more attractive to prospective purchasers. Trecom also created a Product Marketing Plan, a Product Brief, and a manual for GURU. To expose the software to potential buyers, Trecom exhibited it at an international trade show in New York. Trecom also negotiated with numerous third party vendors in an effort to consummate a licensing or sales agreement. Trecom paid for Prasad and others to travel to various cities to negotiate with interested vendors.[3] Prasad does not dispute that Trecom did any of this. All of these efforts eventually proved futile and Trecom finally made a business decision to abandon the project. This was a good faith decision made after devoting considerable resources and energy to the project. Cf. Zilg v. Prentice–Hall, Inc., 717 F.2d 671 (2d Cir.1983), cert. denied, 466 U.S. 938, 104 S.Ct. 1911, 80 L.Ed.2d 460 (1984) (holding that once a publisher had undertaken reasonable initial promotional activities for a book including a first printing and an advertising campaign adequate to give the book a reasonable chance to succeed, any later decision to reduce advertising or decrease the number of books printed need only be "a good faith business judgment"). The law does not require that a party act in vain or incur unreasonable costs and efforts in an attempt to sell what it concludes to be a unmarketable product. See Perma Research, 402 F.Supp. at 881.

Prasad contends that Trecom failed to update GURU in order to make it compatible with the more recent versions of DB2, rendering the software obsolete.[4] See Prasad Cert. ¶ 28. Prasad claims that Trecom's failure to convey a sense of commitment to updating the software resulted in potential purchasers losing interest in GURU. See Prasad Cert. ¶ 21. These assertions set forth in Prasad's certification, however, are merely conclusory statements by the counter claimant of what he now feels Trecom should have done. Prasad does not refer the Court to any evidence in the record suggesting that he asked Trecom to update the software in 1991 or 1992. Prasad was a member of the GURU Project Team which had monthly meetings but there is no evidence that the need to update the software was ever raised by him or anyone else at these meetings. This Court cannot find that Trecom had an "implied" obligation to update GURU each time a new version of DB2 was released without reference to some contractual language or specific conduct by the parties suggesting that this was expected. Given the constantly changing nature of the computer software industry, implying such a duty would impose far too great of a burden on Trecom. Prasad estimates that it would now cost between $1.5 and $2.0 million to modify GURU to make it compatible with the current version of DB2 and that such a project could take up to eighteen months to complete. See Prasad Dep. at 277–78. The law cannot require Trecom to expend such substantial resources to modify a product which it deems doomed to fail in the marketplace absent any evidence that it had agreed to

---

3. Prasad admits that Trecom sent him and others to Boston, Washington D.C., and Naples, Florida to negotiate with prospective purchasers and fully paid for all of these trips. See Prasad Dep. at 195–96, 258.

4. Prasad claims that at the time Trecom acquired the rights to GURU, it was made for the then current 2.1 version of DB2. Since then, several new versions of DB2 have been introduced, namely 2.2, 2.3, 3.0, 4.0, and the most recent release, 5.0. See Prasad Cert. ¶ 2.

undertake this obligation. If Prasad had wanted such a commitment from Trecom, he should have expressly spelled out Trecom's obligations in the contract instead of relying upon a prefatory "whereas" clause. The contract is silent as to Trecom's duties to update the software.

With regard to Prasad's claim that Trecom breached the contract by failing to enter into a sales or licensing agreement with third party vendors that made offers for the software, the Court finds that Trecom's decisions to reject such offers were good faith business judgments. Trecom has explained that it rejected these offers because the vendors refused to pay it any money up-front and insisted that Trecom indemnify them in the event any person sued based on a defect in the software. It follows then that Trecom's decision not to enter into these deals should be viewed with the deference normally afforded to informed business judgments when there is no showing of self-interest or fraud. Furthermore, the Agreement explicitly provided that Trecom had the "sole, absolute, and unconditional right to establish" the terms, conditions and prices for any license it wished to grant. *See* GURU Agreement ¶ 3(g). Thus, Trecom was clearly within its rights in rejecting the proposed offers.

The Court also notes that Trecom offered to return the rights and title to GURU to Prasad when it decided to abandon the project in late 1992 or early 1993. *See* Prasad Dep. at 142. Although it is disputed whether such a conveyance was ever finalized, that Trecom even presented this offer is indicative of its good faith. Furthermore, the Court wonders why Prasad did not object to Trecom's decision to terminate the GURU project until approximately three years after this business decision was made. Prasad continued working at Trecom until November 1995 and stated during his deposition that he never had discussions regarding the software after the project was abandoned in late 1992 or early 1993. *See* Prasad Dep. at 238–39. Prasad has offered no explanation for his delayed response.

New products and technology are developed every day. The reality is that certain inventions prove to be profitable while the great majority never pans out. The Court concludes that Prasad's software unfortunately fell into this latter category even though Trecom acted in good faith and with due diligence in its attempt to enhance and market GURU. The law cannot require Trecom to do more.

## IV. CONCLUSION

For the foregoing reasons, the Court grants Trecom's motion for summary judgment dismissing Prasad's Counterclaim.

**SO ORDERED.**

### ORDER

This matter arises on the motion of plaintiff Trecom Business Systems, Inc. for summary judgment dismissing defendant Nallur Prasad's Counterclaim. Upon consideration of the submissions of the parties and for the reasons stated in the accompanying opinion, the Court rules as follows:

The Court **grants** plaintiff's motion for summary judgment dismissing the defendant's Counterclaim.

**SO ORDERED.**