Dr. Marcia S. WASSERMAN, Plaintiff,

v.

The CITY OF NEW YORK, Mikhail Ryazantseu, Gerald Puca, "John Doe", and the Staten Island Hospital, Defendants.

No. CV–90–0201.

United States District Court, E.D. New York.

Oct. 8, 1992.

Alan M. Shapey, Harry H. Lipsig & Partners, New York City, for plaintiff.

Steven Levi, Asst. Corp. Counsel, Law Dept., New York City, for City of New York.

Christopher Jeffries, Rivkin, Radler, Dunne & Bayh, Uniondale, N.Y., for defendant Puca.

Cartiglia & Connolly, Hempstead, N.Y., for defendant Ryazantseu.

Paul I. Klein, Belair, Klein & Evans, New York City, for defendant Staten Island Hosp.

## MEMORANDUM AND ORDER

GLASSER, District Judge:

Plaintiff Dr. Marcia Wasserman filed this action on January 19, 1990, alleging in her complaint that defendants' negligence caused her to suffer numerous injuries. Specifically, plaintiff was injured in a traffic accident on Rockland Avenue in Staten Island on November 27, 1988 at approximately 8:10 p.m. Plaintiff's westbound car apparently crossed the center line at the curve near 916 Rockland Avenue, striking the eastbound vehicle of defendant Mikhail Ryazantseu. At the time of the accident, driving conditions were poor, as it was dark outside and had been raining for some time.

Defendants City, Ryazantseu, Puca, and "Doe" move for summary judgment under Federal Rule of Civil Procedure 56. The court addresses these motions in turn, with the facts peculiarly relevant to each motion set out at greater length below.

### I. Defendant City of New York

Defendant City of New York moves for summary judgment on the grounds of qualified immunity for traffic planning decisions. Because the City demonstrates that its choice and implementation of its traffic plan had a rational basis consistent with New York law, the motion is granted.

### A. The City's study and improvement of Rockland Avenue

The City was aware as early as 1986 that changing traffic patterns had made rural Rockland Avenue, which the City owns and designed, into a major thoroughfare carrying traffic across Staten Island. The City also knew that from 1985 through 1987 several fatal automobile accidents had occurred on Rockland Avenue's 2.5 miles of roadway. None of those accidents, nor any of the non-fatal accidents noteworthy for the number of injuries involved, had occurred in the immediate vicinity of 916 Rockland Avenue, which lies roughly 500 feet west of Forest Hill Road; rather, the most serious accident sites were clustered roughly three-quarters of a mile east of

that curve, between Brielle Avenue and Manor Road.

According to the deposition testimony of Richard Retting, former chief of the City's Department of Transportation ("DOT") safety division, in 1987 DOT conducted an exhaustive review of Rockland Avenue's signage, road condition, and accident history. (Retting Aff. 27–28) DOT obtained the relevant accident reports from the police department, analyzing and separating them according to type of accident and section of roadway. (Levi Affirmation Exh. J) This review also involved numerous field visits to sections of the road. (Retting Aff. 28) Joseph Albano, Staten Island Borough Engineer, who at the same time conducted his own analysis of Rockland Avenue's accident history over the previous 3 years, also took part in that personal inspection of Rockland Avenue, and accompanied Retting on at least one occasion. (Retting Aff. 28) According to their studies, at least 263 accidents had occurred on Rockland Avenue during the three and one-quarter years prior to August 1986.[1] (Exh. H)

As a result of the evaluation of Rockland Avenue's accident history, in and around August 1987 the City added 182 new safety signs and 280 reflectors at various points along the roadway, installed 14,000 feet of thermoplastic lane markings, reduced speed limits or posted lower advisory limits, and approved a $400,000 emergency contract for a capital improvement plan. The latter plan involved the erection of concrete barriers and the widening of the road along the stretch (between Brielle and Manor) where the overwhelming majority of fatalities had taken place. The decisions whether to make capital improvements (i.e., major reconstruction) on a given portion of roadway or simply to improve signage. were based on the history of fatal and severe accidents along Rockland Avenue. Fiscal constraints also dictated that only priority locations receive major capital improvements.

As part of this overall improvement plan for Rockland Avenue, the City installed additional "slippery when wet" and 20 mph advisory signs along the roadway leading up to the 916 Rockland curve. Existing "curve warning" signs were also enlarged from 36 inches to 48 inches on a side. (Albano Aff. 17–18) The City abandoned tentative plans to "scarify" (cut grooves into) the roadway, according to Retting, because grooved pavement poses steering hazards to some vehicles (such as motorcycles), and because it leads to more rapid degradation of the road surface from puddling and freezing. (Retting Aff. 92–93)

Plaintiff has submitted to the court additional evidence relating to the accident history of the curve in question. Annexed as Exhibit D to the Shapey Affirmation is a November 5, 1980 memo prepared by the Highway Safety Officer of the 122nd Precinct which details an extremely high accident rate (12 in five months) at the site. The memo requests a traffic study, and suggests that "existing overhead flashing arrow and curve warning signs ... are not curtailing the very high accident rate on Wet Pavement." A second memo, dated November 29, 1982, reports 26 accidents in an 11–month period, 20 of them occurring on wet pavement. (Exh. E) This memo likewise states an opinion that the existing signage was insufficient to warn motorists of the danger, and suggests, *inter alia*, the installation of a guardrail and scarification of the road surface. As plaintiff notes, the

---

1. Of the 263 accidents listed in police records for the time period 1/1/84 through 3/31/87, exactly 8 are attributed to the vicinity variously described as "IFO [in front of] 916 Rockland", "IFO 899 Rockland", or 250 to 400 feet "w/o [west of] Forest Hill Rd." Exh. J. The date, time of day, type of collision, and apparent cause are summarized here:

| | | | |
|---|---|---|---|
| 3/24/84 | 12:45 a.m. | fixed object | wet/slippery |
| 4/3/85 | 12:15 p.m. | sideswipe | wet/slippery |
| 6/28/85 | 2:30 p.m. | sideswipe | wet/slippery |
| 8/10/85 | 7:05 p.m. | sideswipe | dry pavement |
| 9/6/86 | 4:20 a.m. | sideswipe | wet/slippery |
| 9/8/86 | 9:30 p.m. | fixed object | alcohol |
| 10/3/86 | 5:15 p.m. | sideswipe | wet/slippery |
| 10/13/86 | 2:40 p.m. | head-on | wet/slippery |

Retting deposition shows that these documents were never considered during the 1987 review of Rockland Avenue safety problems. According to the affidavit of John Gardynik, the resident-owner of 916 Rockland, the curve was repaved after both of these memoranda were written. (Gardynik Aff. ¶ 6, at Shapey Aff. Exh. A)

Plaintiff has also submitted a videotape made by Albano during a daytime Rockland Avenue drive-along inspection on September 17, 1987. (Shapey Aff. Exh. K) The tape shows the entire length of the avenue as seen by a vehicle driving in either direction, and includes Albano's narrative remarks concerning roadway features as they appear. While approaching the curve from the west (Kelly Boulevard), Albano makes the following remarks:

> We are now approaching one of our first dangerous curves on Rockland Avenue, a point which is approximately 500 feet west of Forest Hill Road. As you can see, we have recently installed oversize signs with 20 mph speed limit signs, "slippery when wet" signs, and there's also a flashing yellow light at this location. However, you can see on the right-hand side of your screen a stone wall which shows evidence of a tremendous amount of accidents at this location.

During these comments, the tape shows a series of signs on the right-hand side of the road leading to the curve: a 25 mph sign; a large left-turn arrow sign (black on yellow, in a diamond) atop a 20 mph advisory sign; a "slippery when wet" pictographic sign atop a corresponding legend; a stack of two alternating flashing yellow lights directly above the roadway at the start of the curve; and a large reflectorized diamond (beneath a large left-arrow sign) mounted on the stone wall.

On the return trip, Albano's comments are substantially the same, except that he observes that "accidents that have been occurring at this intersection are not as severe as what has been taking place in the other section of Rockland Avenue." In sequence, the tape also shows a series of signs mirroring those described above: a large right-turn arrow sign with 20 mph

advisory; a "slippery when wet" sign (partly obscured by vegetation); and a reflectorized diamond/arrow combination atop the wall. Albano comments on the presence of the flashing lights, but they are not clearly visible on the tape.

### B. Qualified governmental immunity under New York law

Under well-established New York Law, municipalities and other governmental entities are entitled to qualified immunity from liability for reasoned highway planning decisions. This doctrine traces its roots to the seminal case of *Weiss v. Fote*, 7 N.Y.2d 579, 200 N.Y.S.2d 409, 167 N.E.2d 63 (Ct. App.1960), where the Court of Appeals observed,

> To accept a jury's verdict as to the reasonableness and safety of a plan of governmental services and prefer it over the judgment of the governmental body which originally considered and passed on the matter would be to obstruct normal governmental operations and to place in inexpert hands what the Legislature has seen fit to entrust to experts.

*Id.* 200 N.Y.S.2d at 413, 167 N.E.2d at 66. As the Court of Appeals elaborated in *Friedman v. State*, qualified immunity will not shield a municipality only where "its study of a traffic condition is plainly inadequate or there is no reasonable basis for its traffic plan...." 67 N.Y.2d 271, 502 N.Y.S.2d 669, 674, 493 N.E.2d 893, 898 (Ct.App.1986) (citation omitted). In other words, "when a municipality studies a dangerous condition and determines as part of a reasonable plan of governmental services that certain steps need not be taken, that decision may not form the basis of liability...." *Id.* 502 N.Y.S.2d at 676, 493 N.E.2d at 900 (citation omitted).

Thus, the mere proffer of expert testimony disputing a plan's adequacy will not in itself permit a claim to go forward. In order for the "reasoned decision" standard to remain meaningful in light of the limited waiver of sovereign immunity for highway accidents, "'something more than a mere choice between conflicting opinions of experts is required before the State or

one of its subdivisions may be charged with a failure to discharge its duty to plan highways for the safety of the traveling public....'" *Friedman*, 502 N.Y.S.2d at 674, 493 N.E.2d at 898 (quoting *Weiss*, 7 N.Y.2d at 588, 200 N.Y.S.2d 409, 167 N.E.2d 63). Indeed, as the *Friedman* court went on to observe,

> Strong policy considerations underpin the qualified immunity doctrine set forth in *Weiss* ... and, in cases such as these where a governmental body has invoked the expertise of qualified employees, the *Weiss* directive should not be lightly discounted. Appellants would have us examine the criteria that were considered by the State's professional staff, emphasize factors allegedly overlooked, and, with the benefit of hindsight, rule that the studies were inadequate as a matter of law. We decline this invitation, for to do so ... "would constitute the type of judgment substitution that *Weiss v. Fote* ... prohibits".

*Id.* 502 N.Y.S.2d at 675–76, 493 N.E.2d at 899 (quoting *Muller v. State*, 108 A.D.2d 181, 488 N.Y.S.2d 751 (App.Div.2d Dept. 1985)).

An examination of cases in which liability was established reveals two main scenarios exempted from the immunity rule. In the first instance, a city's study or plan may simply fail to be reasonable: for example, a city was held liable where it had failed to install a stop sign as mandated under state law because its traffic engineer believed (incorrectly) that the city lacked authority to install signs on private roads. *See Alexander v. Eldred*, 63 N.Y.2d 460, 483 N.Y.S.2d 168, 171, 472 N.E.2d 996, 999 (Ct.App.1984). Having neglected even to consider the merits of installing the sign, the city there lacked any legal justification for its forbearance. *Id.* In the alternative, a governmental body may articulate a reasonable plan, only to fail unjustifiably to implement it in a reasonably timely manner. As the *Friedman* court notes, "an unjustifiable delay in implementing the plan constitutes a breach of the municipality's duty to the public just as surely as if it had totally failed to study the known condi-

tion in the first instance." 502 N.Y.S.2d at 676, 493 N.E.2d at 900.

This case presents none of those circumstances. The record makes abundantly clear that the independent and joint studies undertaken by Retting and Albano—both of whom are clearly qualified to conduct such studies and make appropriate recommendations for implementation, by virtue of their extensive experience and professional qualifications—meet the test of reasonableness sufficient to establish immunity. The fact that the studies focused on the entire length of Rockland Avenue, and not solely on the 916 Rockland curve, does not diminish that conclusion. On the contrary, the extent of the information incorporated into the decisionmaking process—over three years' worth of accident records, as well as in-person inspections of the full 2.5 miles of roadway—was inarguably adequate to give the City a clear picture of Rockland Avenue's potential defects, both individually and in comparison with each other.

The court rejects plaintiff's contention that DOT's failure to consider the 1980 and 1982 police memos amounts to a failure of duty. To begin with, plaintiff's own papers make clear that the curve was repaved (and subjected to other unspecified improvements) between the writing of the police memos and the 1987 studies. In addition, the extensive accident data compiled by DOT for use in its studies were substantially more up-to-date (and therefore more reliable), and covered a far greater period of time than the two police memos combined. Given these facts, it is doubtful that the memos would have been determinative or even useful in assisting DOT in formulating a plan for improvements. *Cf. Van de Bogart v. State*, 133 A.D.2d 974, 521 N.Y.S.2d 125, 127 (App.Div.3d Dep't.1987) (failure of state's engineer to interview neighboring landowners to ascertain extent of unreported accidents at curve does not prove that study was inadequate).

In the alternative, plaintiff contends that the plan eventually adopted and implemented lacked a rational basis. As before, this position is without merit. The undisputed

record reveals that the City's primary objective in addressing the problems of Rockland Avenue was to improve the stretches of roadway that were demonstrably more hazardous to the public. The record also demonstrates that having considered the recorded accidents at 916 Rockland—8 accidents out of over 260, none of which apparently resulted in serious injury—the City took affirmative steps to improve signage (*inter alia*, the wet pavement warning) and to reduce the advised speed limit for the curve.

Plaintiff attempts a variety of *post hoc* criticisms of this decision, claiming variously that road scarification, guard rails, median barriers, and road geometry modification were necessary to render the curve reasonably safe. Plaintiff's experts claim that the City's failure to undertake such extensive restructuring of the roadway raises a question of fact sufficient to defeat the motion for summary judgment. However, as *Friedman* and other courts have observed, such expert testimony cannot defeat qualified immunity simply through second-guessing. *See, e.g., Rittenhouse v. State*, 134 A.D.2d 774, 521 N.Y.S.2d 824, 825 (App.Div.3d Dep't.1987); *Van de Bogart*, 521 N.Y.S.2d at 126–27 (citing *Friedman*).

It also bears noting that even to the extent that this court must assess the actual safety of the curve (in evaluating the reasonableness of the final plan as adopted), plaintiff does not carry the substantial burden imposed by New York law. As the Court of Appeals has declared, "so long as a highway may be said to be reasonably safe for people who obey the rules of the road, the duty imposed upon the municipality is satisfied." *Tomassi v. Town of Union*, 46 N.Y.2d 91, 412 N.Y.S.2d 842, 844, 385 N.E.2d 581, 582 (Ct.App.1978) (citation omitted). Thus, as the *Van de Bogart* court noted in discussing a factual question similar to that presented here, "no major restructuring was required unless the curve could not safely

have been negotiated at moderate speed." 521 N.Y.S.2d at 127 (citation omitted). At the same time, the calculus also incorporates, *inter alia*, considerations of "fiscal practicality". *Tomassi*, 412 N.Y.S.2d at 844, 385 N.E.2d at 582; *see also Van de Bogart*, 521 N.Y.S.2d at 127 (taking into account "relative costs and fiscal priorities").

Plaintiff has adduced no significant evidence, such as post–1987 accident records, to show that the curve as improved was demonstrably unsafe. Since literally thousands of vehicles navigated the curve in question each day without incident,[2] it is simply impossible to believe—as the court must in order to deny summary judgment—that the 916 Rockland curve was unreasonably dangerous.

In the affidavits and elsewhere in the opposition papers, moreover, plaintiff tries to have it both ways, so to speak. Plaintiff seizes upon every mention in the City's records of the problems with Rockland Avenue (and of the necessity for capital improvements) as an indictment of the 916 Rockland Avenue curve, when even a cursory examination of the record makes clear that the vast majority of those remarks related to the "serpentine curve" section between Brielle and Manor where numerous fatalities had occurred. At the same time, plaintiff seeks to divert attention from the fact that the City's 1987 improvement program was a *comprehensive* scheme designed to address the various deficiencies in the roadway's design, with each improvement regarded not in isolation but rather in relation to the remainder of the roadway. It remains undisputed, moreover, that the City's plan assigned importance to needed improvements commensurate with the severity of injury in earlier accidents—and therefore focused accordingly on the "serpentine curve" section of Rockland. (Retting Aff. 138–40, at Levi Reply Aff.Exh. R)

---

2. According to DOT's 1987 figures, the section of Rockland Avenue between Richmond Avenue (at the westernmost point) and Forest Hill Road (500 feet to the east of the curve) at that time carried over 9,800 vehicles on average each day (east- and west-bound figures combined), or over 3.5 million vehicles each year. Levi Aff. Exh.J. at 2.

Plaintiff also alleges that at least one of the warning signs near the 916 Rockland curve is improperly positioned to provide notice of the roadway condition to westbound traffic. Specifically, plaintiff's engineering expert Daniel Haines attests that the placement of the SW–11 sign (large right turn arrow)[3] 400 feet east of the intersection is deceptive to motorists in that it provides excessively early notice of the curve. (Haines Aff. 18, at Shapey Aff. Exh. N) Haines claims that the proper distance from the curve for this type of sign is 200 feet, according to the Manual of Uniform Traffic Control Devices (*MUTCD*) for the New York State DOT Traffic and Safety Division.[4] Plaintiff suggests that this alleged failure to comply with the MUTCD constitutes a basis for liability, relying on *Peckham v. State*, 54 A.D.2d 599, 387 N.Y.S.2d 491, 492 (App.Div. 4th Dep't 1976). In that case, the court noted the State had failed to install "no passing" signs at a location whose geometry required them. In the present case, by contrast, there is no claim that the City failed to provide warning, but rather the lesser assertion that the sign was placed too far in advance.

This suggestion fails to furnish a basis for liability for two separate reasons. In the first place, the distances listed in Table 230–2 are not mandatory. Rather, the table "provide[s] values which should be used *as guides* in determining advance posting distances.... *These values are suggested advance posting distances....*" *MUTCD* § 230.2(b)(3) (emphasis supplied). Moreover, as the supplementary Albano affidavit points out, positioning is partially dependent on the location of nearby signs such as the "slippery when wet" (W4–8)

signs posted nearer the 916 Rockland curve. Specifically, "[s]ign installations should be at least two hundred feet apart where possible." *MUTCD* § 201.5(d)(2)(i). Since the W4–8 is a Category III sign, and requires less advance notice than a Category II, *see id.* § 234.7(b) & Tables 230–2 & 230–3, placement of the Category II curve sign further from the curve at 916 Rockland (and thereby sufficiently separated from the second sign) was in fact fully consistent with the *MUTCD*. *See id.* § 201.5(d)(2)(ii), (iii).

Second, plaintiff can claim no prejudice from the extra distance between the advisory speed limit sign (below the curve arrow) and the curve in the roadway. According to her own deposition testimony, she was traveling at 10–15 mph just before the accident, and she believed that the speed limit in the area was 20 mph. (Wasserman Depos. 106–07, at Levi Aff.Exh. C) Under these circumstances, there is no causal link between the City's alleged failing and plaintiff's mishap. *See Morrison v. Flintosh*, 163 A.D.2d 646, 558 N.Y.S.2d 690, 692 (App.Div.3d Dep't 1990).[5]

Finally, plaintiff suggests incorrectly that this case falls within the ambit of the recent decision in *Ames v. City of New York*, 177 A.D.2d 528, 575 N.Y.S.2d 917 (App.Div.2d Dep't 1991). As a reading of *Ames* makes clear, however, that case involved the "unreasonable delay" exception noted above. *See* 575 N.Y.S.2d at 921 (quoting extensively from *Friedman*). That exception encompasses situations where a municipality in fact decides that certain improvements are necessary, but delays their implementation for an exces-

---

3. The City's schematic maps, as well as the Albano videotape of September 17, 1987, indicate that below the SW–11 was a yellow rectangular advisory sign (SW–12(20)) suggesting a speed of 20 mph.

4. The *MUTCD* is reprinted in N.Y.Comp.Codes R. & Regs. tit. 17. According to Table 230–2, the recommended advance posting distance for such a sign ranges from 200 to 1010 feet, depending on the "85th percentile approach speed". For an assumed approach speed of 40 mph, the distance given is 350 feet.

5. Plaintiff also suggests that the placement of the curve arrow sign so near to Forest Hill Road creates a situation in which southbound drivers turning west onto Rockland Avenue may not notice the sign. This observation is without relevance, since there is no indication that plaintiff falls within this class; on the contrary, her deposition and affidavit suggest instead that plaintiff drove directly through the intersection westbound on Rockland.

sive period of time.[6] Aside from the fact that *Ames* involved a delay in excess of 9 years, a far greater span than the interim period between the 1987 plan and plaintiff's 1988 accident, the present case simply does not involve a failure to implement, since the City's plan clearly does *not* call for major capital improvements at 916 Rockland.[7]

In summary, the City has made an adequate showing that it gave not only reasoned but careful consideration to improving the roadway, and made reasoned decisions in allocating resources toward that end. While DOT made more substantial improvements at locations other than 916 Rockland, this court cannot say that the improvements in signage there were unreasonable in light of the relative problems at that location, or that the installation of those improvements was improperly delayed. For these reasons, the City's motion is granted.

## II. Defendant Ryazantseu

■ Defendant Mikhail Ryazantseu moves for summary judgment on the ground that plaintiff has failed to make a prima facie showing of negligence on defendant's part. For the reasons below, the motion is granted.

The facts relevant to this motion are as follows: Ryazantseu stated at his deposition that he was traveling 10–15 mph at the time the accident occurred, and that Wasserman's vehicle, heading toward him, was traveling 20–30 mph. (Ryazantseu Depos. at 29) He also stated that his headlights were on at the time of the accident. (*Id.* at 11) Ryazantseu further stated that whereas his vehicle remained a foot or two on the

proper side of the center double yellow line, plaintiff's vehicle crossed the line, causing a collision at that same point. (*Id.* at 31–33) Plaintiff has no independent recollection of the accident. However, Officer Richard Olivo, who arrived at the scene shortly after the collision and filed an accident report, stated that both vehicles came to rest entirely on the eastbound side of Rockland Avenue (the side on which Ryazantseu had been traveling). (Olivo Depos. at 28, 80)

Under the familiar standard of Rule 56, summary judgment is appropriate where there is no genuine issue as to any material fact. Put differently, the question to be resolved by the court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so onesided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). Summary judgment is therefore appropriate against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2554–55, 91 L.Ed.2d 265 (1986).

Moreover, it is clear under the rule that in order to raise a genuine issue of material fact, the opposing party must submit affidavits made upon personal knowledge, and cannot rely merely upon denials of a general nature. Fed.R.Civ.P. 56(e) ("Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters

---

**6.** Contrary to plaintiff's suggestion, fiscal limitations and funding priorities may indeed justify a period of delay before implementation. *See Friedman,* 502 N.Y.S.2d at 676, 493 N.E.2d at 900.

**7.** The court is unmoved by plaintiff's tortured reading of plaintiff's exhibits H and L, which (as discussed at greater length above) manifestly contemplate capital improvements on the "serpentine curve" stretch, and not at 916 Rockland. Likewise, the 3/9/88 Albano letter to Laura LoPresti (Exh. J) simply does not constitute the

adoption of an official plan or policy. In any event, the mere mention of possible future improvements even in a plan itself does not imply the necessity of making those changes immediately. *See Kissinger v. State,* 126 A.D.2d 139, 513 N.Y.S.2d 275, 277 (App.Div.3d Dep't 1987). As the Court of Appeals has stated, the fact that "any public roadway, no matter how careful its design and construction, can be made safer" should not convert a municipality "into an insurer of the safety of its highways." *Tomassi,* 412 N.Y.S.2d at 844, 385 N.E.2d at 583.

stated therein."); *cf. Zuckerman v. City of New York,* 49 N.Y.2d 557, 427 N.Y.S.2d 595, 598, 404 N.E.2d 718, 721 (Ct.App.1980). As the Supreme Court stated in *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986), the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts."

■ The affirmation of plaintiff's counsel in opposition to the motion recites several grounds for allowing the claims to go forward. For various reasons, these arguments and submissions are unavailing. In the first place, plaintiff's counsel submits only his own affirmation and a brief excerpt of the Ryazantseu deposition. The former is itself without evidentiary value, and the speculation therein as to the cause of the accident forms no basis for denying the motion.

Plaintiff also points to aspects of Ryazantseu's deposition testimony allegedly supporting a claim of negligence. For instance, plaintiff contends that Ryazantseu admits that his vehicle skidded. In fact, it is clear from the transcript that Ryazantseu, who does not speak English well, had difficulty in understanding the question, and that his eventual answer was, in its entirety, "No, not skidding. Going slowly, going—that is it; not skidding." (Ryazantseu Depos. at 31)

Plaintiff also notes that Ryazantseu did not sound his horn, but omits the fact that Ryazantseu testified that Wasserman's vehicle struck his immediately after crossing the center line. (Ryazantseu Depos. at 33) Where a plaintiff's vehicle suddenly crosses onto the wrong side of the roadway, striking the defendant's vehicle, and there is no evidence of negligence on the defendant's part, summary judgment must be granted in favor of the defendant. *See, e.g., Eisenbach v. Rogers,* 158 A.D.2d 792, 551 N.Y.S.2d 385, 386 (App.Div.3d Dep't 1990); *Morowitz v. Naughton,* 150 A.D.2d 536, 541 N.Y.S.2d 122, 124 (App.Div.2d Dep't 1989); *Viegas v. Esposito,* 135 A.D.2d 708, 522 N.Y.S.2d 608, 609 (App.Div.2d Dep't 1987), *appeal denied,* 72 N.Y.2d 801, 530 N.Y.S.2d 553, 526 N.E.2d 44 (Ct.App.1988); *Tenenbaum v. Martin,* 131 A.D.2d 660, 516 N.Y.S.2d 741, 742–43 (App.Div.2d Dep't 1987); *Carter v. County of Erie,* 98 A.D.2d 963, 470 N.Y.S.2d 186, 186–87 (App.Div. 4th Dep't 1983). Under such circumstances, " '[i]t is well settled that "a shadowy semblance of an issue or bald conclusory assertions, even if believable, are not enough" to defeat a motion for summary judgment.' " *Morowitz,* 541 N.Y.S.2d at 124 (citations omitted).

In this case, the available facts point to the conclusion that Ryazantseu bears no blame for the accident. Rather than supply new facts, or offer plausible alternative readings of the available information, plaintiff's counsel resorts to broad allegations of negligence and to dubious readings of the Ryazantseu deposition testimony. Because such assertions fail to raise a material factual issue proper for jury consideration, Ryazantseu's motion is granted, and the claims and cross-claims against him dismissed.

### III. Defendants Puca and "Doe"

■ Defendants Gerald Puca and Geraldine Puca (named in the complaint as "John Doe", owner of the Puca vehicle) move for summary judgment on the ground that plaintiff has failed to make a prima facie showing that Gerald Puca proximately caused plaintiff's injuries. For the reasons below, the motion is granted.

The facts relevant to this motion are as follows: Defendant Gerald Puca arrived at the accident scene shortly after the collision of the Wasserman and Ryazantseu vehicles. The police report indicates that Puca was arrested for driving while intoxicated.

Certain other facts are in dispute. In his examination before trial, Puca contended that his vehicle had not struck either of the other vehicles or come into contact with any of the various individuals present. By contrast, the police report states that Puca's car struck both of the Wasserman and Ryazantseu vehicles, and that Puca's car also collided with four persons at the accident scene (most of whom were emer-

gency personnel assisting the victims of the first collision): Thomas Finn, Thomas Pittaressi, Richard Hansen, and Ryazantseu. The report does not list Wasserman as among those involved in this second collision. In his own deposition, Ryazantseu corroborates these details.

Fireman Robert Pinto, one of the emergency personnel assisting at the scene, stated on deposition that at the time Puca's car arrived and the second collision occurred, Wasserman has been removed from the roadway and placed atop a stone wall abutting the road. (Pinto Depos. at 35) Pinto also averred that he could not say that the Puca collision had directly or indirectly caused Wasserman's body to move.

Wasserman's own deposition reveals that her recollection of the events subsequent to the initial collision is fragmentary. She recalls lying in the roadway with Ryazantseu and a second person over her, then blacking out, and then hearing a screech (as of a skidding car), but recalls no second crash.

It is black-letter tort law that in order to prove liability, a plaintiff must show proximate cause as well as negligence. Where a plaintiff fails to establish a genuine issue of fact as to defendant's proximate causation of plaintiff's injuries, summary judgment is appropriate. *See Lomnitz v. Town of Woodbury*, 81 A.D.2d 828, 438 N.Y.S.2d 825, 827 (App.Div.2d Dep't 1981).

To carry the burden of establishing a prima facie case, and thereby to escape summary judgment, a plaintiff must show that the defendant's negligence was a substantial cause of the injury. *Derdiarian v. Felix Contracting Corp.*, 51 N.Y.S.2d 308, 434 N.Y.S.2d 166, 169, 414 N.E.2d 666, 670 (Ct.App.1980). Thus, where a defendant claims that his vehicle never struck plaintiff, and that assertion remains unrebutted, the defendant's motion for summary judgment must be granted. *See Calfon v. Gunhill Private Limousine Corp.*, 91 A.D.2d 531, 457 N.Y.S.2d 6, 7 (App.Div.2d Dep't 1982).

In this case, plaintiff's "3F statement" [8] contends, in item (3), that "[t]here are triable issues of fact with regard to proximate cause that must be resolved by a jury...." In support of this contention, the affirmation of plaintiff's counsel recites the following:

5. Plaintiff recalls that following the initial collision, she got out of her vehicle and was laying [sic] on the roadway.
6. She then heard the screech of a motor vehicle (the PUCA vehicle), and next remembers regaining consciousness with her bodyy [sic] now on top of a stone wall.
7. The clear inference from her testimony is that the motion of the PUCA vehicle caused her body to be propelled onto a wall. Whether or not there was contact, or whether the reckless driving of the PUCA vehicle caused plaintiff to move out of the way of his vehicle, or caused her rescueers [sic] to drop her onto a wall, are questions to be resolved by a jury.

It is well settled that where an "affidavit is vague, conclusory, [and] contradicted by documentary evidence in the record," the offering party fails to raise a factual issue. *Sweeney v. McCormick*, 159 A.D.2d 832, 552 N.Y.S.2d 707, 708 (App.Div.3d Dep't 1990). For example, in the leading case of *Donlon v. Pugliese*, 27 A.D.2d 786, 277 N.Y.S.2d 334 (App.Div.3d Dep't 1967), the court granted summary judgment for defendant where "plaintiff's affidavit stat[es] merely that he 'has no real recollection of the accident [but] feels that the accident * * * was caused by the negligence'" of the defendant. *Id.* 277 N.Y.S.2d at 336. As the court observed, in such cases there is an obligation to grant summary judgment "rather than to strain to find issues, however nebulous, which may preserve an unfounded claim for litigation or negotiation." *Id.*

Here, Wasserman's own testimony furnishes a disjointed and unreliable account of the events subsequent to the first colli-

---

**8.** The court construes this document as a statement of disputed issues of material fact, as required by Local Civil Rule 3(g).

sion. In fact, while plaintiff's counsel states that the screech heard by Wasserman was "the PUCA vehicle," Wasserman's own inability to recall any noise thereafter indicating a collision renders this identification entirely speculative. More importantly, the police report and Pinto's account—far more reliable sources—indicate that Puca's negligence in no way contributed to plaintiff's injuries. Pinto's own testimony that he and others moved Wasserman to safety before Puca arrived rebuts the supposedly "clear inference" that Puca's negligence somehow "propelled [plaintiff] onto a wall." Indeed, even the testimony of Ryazantseu, whose interests would be served by assigning blame to Puca, offers support on the other side.

While this court disapproves of Puca's irresponsible conduct, it cannot deny him summary judgment where the plaintiff raises no material issue of causation. Since Geraldine Puca's potential liability as the vehicle owner is entirely derivative, summary judgment in her favor is likewise appropriate. Accordingly, the motion is granted, and the claims and cross-claims against the Pucas dismissed.

## CONCLUSION

Accordingly, the defendants' motions are granted in their entirety, and the claims against the City, Ryazantseu, Gerald Puca, and Geraldine Puca (named in the complaint as "John Doe") are dismissed.

SO ORDERED.