G. GOLDEN ASSOCIATES
OF OCEANSIDE, INC. and
Gerald Golden, Plaintiffs,

v.

ARNOLD FOODS COMPANY,
INC., Defendant.

No. 91–CV–2288 (JS).

United States District Court,
E.D. New York.

Dec. 5, 1994.

Lazarowitz & Manganillo, P.C. by Harvey O. Lazarowitz, Brooklyn, NY, for plaintiffs.

Kelley, Drye & Warren by Richard E. Donovan, New York City, for defendant.

### MEMORANDUM AND ORDER

SEYBERT, District Judge:

Before the Court on diversity jurisdiction is a dispute arising out of an assignment of certain technical information and trademarks. Plaintiffs, G. Golden Associates of Oceanside, Inc. ("Golden Associates") and Gerald Golden, the sole shareholder of Golden Associates, allege that defendant, Arnold Foods Company, Inc. ("Arnold"), breached, improperly terminated and tortiously interfered with an agreement, dated August 1, 1983 (the "Agreement"), between plaintiffs and Devonsheer Melba Corporation ("Devonsheer"), defendant's predecessor-in-interest. Under the Agreement, Golden Associates assigned to Devonsheer, in exchange for ongoing sales commissions, technical information necessary to produce a flat bread product and the trademarks "La Crunch" and "La Crunch Une" used by plaintiffs in marketing the product. Plaintiffs claim that defendant, which received assignment of the Agreement from Devonsheer in 1985, wrongfully ceased production of the flat bread product when in February 1989, its parent company, CPC International Inc. ("CPC"), purchased JJ Flats, Inc., a company that had been commercially producing a popular flat

bread product under its own name. Defendant has moved for summary judgment, arguing that its parent company's purchase of JJ Flats did not breach, improperly terminate or tortiously interfere with the Agreement. Plaintiffs have opposed defendant's motion and also asked the Court to issue an order pursuant to Fed.R.Civ.P. 56(d) to the effect that no material issue for trial exists regarding defendant's obligation to pay commissions on all flat bread products sold, regardless of whether the products were made using the technical information supplied by plaintiffs.

## BACKGROUND

In 1983, Golden and his wholly owned company, Golden Associates, developed, produced, and marketed a thin flat bread product under the trademarks "La Crunch" and "La Crunch Une." In the spring of that year, Richard Kaufman, Chief Executive Officer of Devonsheer, expressed to Golden an interest in purchasing the technical information used to make the product and the trademarks "La Crunch" and "La Crunch Une." After several meetings, the parties contracted on August 1, 1983 to transfer to Devonsheer the trademarks and the technical information. The arrangement was exclusive; Section 2 of the Agreement prohibited plaintiffs from transferring or licensing the technical information or trademarks to third parties.

In exchange for this arrangement, Section 3(a) of the Agreement required that "[p]urchaser [Devonsheer] shall pay and deliver to Seller [Golden Associates] sales commissions of one and three-quarters (1¾%) percent of the net sales proceeds received by Purchaser from sales of the Products." The term "Products" was defined, together with other terms, in an initial recital to the Agreement:

WHEREAS, Seller possesses technical information and know-how (the "Technical Information") relating to the production and manufacture of food products which look similar to the thin, crispy crust of 'french bread' from which the dough has been removed (the "Products") and is the sole owner and proprietor of the trademarks "La Crunch Une" and "La Crunch" which it has used in connection with sales of the Products.

Section 6 of the Agreement, which sets forth the degree of discretion Devonsheer was granted in manufacturing, distributing and selling flat breads, is key to the instant dispute. That provision states as follows,

Seller [Golden Associates] and Golden acknowledge that Purchaser's [Devonsheer's] knowledge and experience in the methods of manufacture, distribution and sale of goods similar to the Products places Purchaser [Devonsheer] in the position of determining how the Products can best be manufactured, distributed and sold for the mutual benefit of Seller [Golden Associates] and Purchaser [Devonsheer]. Accordingly, Seller [Golden Associates] and Golden agree that Purchaser [Devonsheer] shall have complete and total discretion in determining the manner and extent to which it will manufacture, distribute, sell or promote the Products, and grant licenses of its rights.

Section 7 of the Agreement contains a non-competition clause, precluding plaintiffs from selling any goods "similar to or competitive with the Products, without the express written consent of Purchaser [Devonsheer]." No comparable clause applies to Devonsheer or any transferee of its interests.

Under Section 14 of the Agreement, Golden Associates was given the right to reacquire the technical information and trademarks being transferred for nominal consideration, under the following conditions:

(a) the net sales proceeds received by Purchaser [Devonsheer] from sales of the Products do not exceed the rate of $500,000 per annum at any time on or after five years from the date of this Agreement; (b) Purchaser [Devonsheer] gives notice exercising such option within the thirty (30) day period commencing with the date on which the net sales proceeds do not exceed such rate at any time on or after five years from the date of this Agreement.

In the summer of 1984, Devonsheer began commercial production of the flat bread product. According to defendant, Devonsheer discontinued commercial production in the fall of 1985 due to lack of sales. In October 1985, defendant claims to have acquired the assets and liabilities of Devonsheer, including assignment and delegation of Devonsheer's

rights and obligations, respectively, under the Agreement. According to defendant, it then developed and sold a variation of "La Crunch," "Nutri–Crunch," to a single customer for a period of about 18 months from mid–1986 through the end of 1987. After the sole customer allegedly ceased placing orders at the end of 1987, defendant terminated production. Defendant claims that Golden Associates received its last commission payment with respect to sales of "Nutri–Crunch" in January 1988. Plaintiffs, on the other hand, allege that the sales of "Nutri–Crunch" continued until 1989 and that Golden Associates received the last commission payment in that year.

According to defendant, net sales under the Agreement exceeded $500,000 only in 1986, declined to $373,080 in 1987, and ceased entirely after 1987 when the sole remaining customer ceased placing orders. Defendant alleges that it paid Golden Associates approximately $30,000 in sales commissions from 1983 to January 1988.

After CPC acquired the assets of JJ Flats in February 1989, plaintiffs commenced the instant action. After completion of discovery, defendant filed the summary judgment motion currently before the Court. This memorandum constitutes the Court's decision with respect to defendant's motion and plaintiffs' request for an order delineating facts not at issue pursuant to Fed.R.Civ.P. 56(d).

### DISCUSSION

A. *Defendant's Motion for Summary Judgment with Respect to Plaintiffs' Breach of Contract and Improper Termination Claim*

Defendant argues that it is entitled to summary judgment because, since CPC's purchase of JJ Flats was not prohibited under the terms of the Agreement, defendant did not breach its obligation to market the flat bread product designed by plaintiffs.[1] A court may grant summary judgment when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). It is not the trial court's function to weigh the evidence and resolve the factual issues. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Balderman v. United States Veterans Admin.,* 870 F.2d 57, 60 (2d Cir.1989). A dispute as to a material fact is "genuine," and summary judgment is inappropriate, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Cruden v. Bank of N.Y.,* 957 F.2d 961, 975 (2d Cir.1992) (citation omitted); *Lang v. Retirement Living Pub. Co., Inc.,* 949 F.2d 576, 580 (2d Cir.1991) (quoting *Anderson,* 477 U.S. 242 at 248, 106 S.Ct. 2505 at 2510). Because granting the motion deprives the nonmoving party of its day in court, the district court in examining the record must resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *See Gallo v. Prudential Residential Serv. Ltd. Partnership,* 22 F.3d 1219, 1223 (2d Cir.1994) (citations omitted); *Richardson v. Selsky,* 5 F.3d 616, 621 (2d Cir. 1993); *Ramseur v. Chase Manhattan Bank,* 865 F.2d 460, 465 (2d Cir.1989) (citations omitted). The party moving for summary judgment bears the burden under Fed. R.Civ.P. 56(c) of demonstrating the absence of any genuine issue of material fact. *See Gallo,* 22 F.3d at 1223 (citations omitted); *Consarc Corp. v. Marine Midland Bank, N.A.,* 996 F.2d 568, 572 (2d Cir.1993) (citations omitted).

---

1. Defendant has also noted that plaintiffs failed to submit on a timely basis a statement of material controverted issues as required by Local Civil Rule 3(g) of the United States District Courts for the Southern and Eastern Districts of New York ("Rule 3(g)"). Defendant claims that plaintiffs should therefore be deemed to have admitted all facts alleged in defendant's Rule 3(g) statement, making summary judgment in defendant's favor appropriate. The Court is unwilling to grant summary judgment in favor of defendant on the basis of plaintiffs' procedural error. Golden did submit an affidavit which may be construed as a substitute for the Rule 3(g) statement. *See Wasserman v. City of New York,* 802 F.Supp. 849, 858 n. 8 (E.D.N.Y.1992); *Citibank N.A. v. Outdoor Resorts of America, Inc.,* 1992 WL 162926, at *4, 1992 U.S.Dist. Lexis 9624 at *10 (S.D.N.Y. June 29, 1992). Moreover, plaintiffs attempted, although without first obtaining permission from the Court, to correct their error by filing a late Rule 3(g) statement together with a sur-reply. The Court will accept plaintiffs' late Rule 3(g) statement of disputed material facts, despite the late filing, but will disregard the sur-reply.

Defendant points to a number of provisions in the Agreement to support its argument that CPC was free to purchase JJ Flats, a competing producer of flat bread products, and that therefore defendant is entitled to summary judgment. Defendant refers to Section 6 of the Agreement which grants defendant "complete and total discretion" to determine "the manner and extent" to which it was to manufacture, distribute, sell and promote the flat bread product designed by plaintiffs. Defendant further notes that while the Agreement prohibits plaintiffs from assigning or licensing to anyone else the technical information for producing the flat breads or the related trademarks, no similar provision applies to defendant. Defendant asserts, moreover, that plaintiffs were not unduly prejudiced by this contractual arrangement, because even though defendant had exclusive rights to the technical information and the trademarks, Golden Associates could repurchase, at any time after August 1988, the technical information and trademarks for a nominal sum, if net sales on or after that date were below $500,000 per annum.[2]

■ Despite the provisions defendant has noted, the Court finds that under New York law, the defendant was required to act in good faith and with due diligence in fulfilling its contractual obligations.[3] It is well settled under New York law that where ongoing commissions or royalties are to be paid in an exclusive arrangement, a court will imply a covenant on the part of an exclusive licensee/assignee to exploit the subject matter of the license/assignment with due diligence "where such a covenant is essential as a matter of equity to give meaning and effect to the contract as a whole." *Vacuum Concrete Corp. of America v. American Mach. & Foundry Co.*, 321 F.Supp. 771, 772 (S.D.N.Y. 1971); *see also Mechanical Ice Tray Corp. v. General Motors Corp.*, 144 F.2d 720, 726 (2d Cir.1944), *cert. denied sub nom. Horton v. General Motors Corp.*, 324 U.S. 844, 65 S.Ct. 679, 89 L.Ed. 1406 (1945); *Parev Products Co., Inc. v. Rokeach & Sons, Inc.*, 124 F.2d 147, 150 (2d Cir.1941); *Van Valkenburgh, Nooger Neville, Inc. v. Hayden Publishing Co., Inc.*, 30 N.Y.2d 34, 45, 281 N.E.2d 142, 144, 330 N.Y.S.2d 329, 333 (1972); *Wood v. Lucy, Lady Duff–Gordon*, 222 N.Y. 88, 91, 118 N.E. 214, 214 (1917) (Cardozo, J.), *reh'g denied*, 222 N.Y. 643, 118 N.E. 1082 (1918). These decisions have reasoned that:

> it would be unfair to place the productiveness of licensed [or assigned] property solely within the control of the licensee [or assignee], thereby putting the licensor [or assignor] at his mercy, without imposing an obligation to exploit upon the licensee [or assignee]. In effect, the court is merely enforcing an obligation which the parties overlooked expressing in their contract or which they considered unnecessary to be expressed.

*Vacuum Concrete*, 321 F.Supp. at 773 (citation omitted); *see also Zilg v. Prentice–Hall, Inc.*, 717 F.2d 671, 678, 680 (2d Cir.1983), *cert. denied*, 466 U.S. 938, 104 S.Ct. 1911, 80 L.Ed.2d 460 (1984).

■ Although a covenant of good faith or due diligence should not be implied if the express terms of the parties' contractual arrangement indicate that they intended otherwise, *City of Yonkers v. Otis Elevator Co.*, 844 F.2d 42, 46 (2d Cir.1988); *Conan Properties, Inc. v. Mattel, Inc.*, 712 F.Supp. 353, 364 (S.D.N.Y.1989) (citing *City of Yonkers*, 844 F.2d at 46), the Agreement does not expressly preclude such a covenant. As defendant notes, the second sentence of Section 6 of the Agreement does give defendant "complete and total discretion." The immediately preceding sentence indicates, however, that defendant's marketing and distribution arrangements were expected to be conducted for the "mutual benefit" of both defendant

---

**2.** In fact, Section 14 is unclear and could be taken to mean that Golden Associates could only have exercised its repurchase right within 30 days of August 1, 1988, as August 1 was in fact "the date on which the net product sales do not exceed [$500,000 per annum]." Since defendant's motion papers indicate that defendant construes this provision more broadly so as to allow Golden Associates to repurchase even after August 30, the Court will assume that the broader reading of the provision was intended by the parties.

**3.** By the parties' express decision, reflected in Section 19 of the Agreement, New York law governs their contractual relationship.

and Golden Associates. The fact that the word "accordingly" begins the sentence giving defendant the right to act with "complete and total discretion," indicates that the two sentences were intended to be read together. Read in tandem, the sentences reveal that plaintiffs agreed, in light of defendant's experience with similar goods, not to interfere with defendant's efforts to sell plaintiffs' flat bread product. In return, plaintiffs would have the benefit of defendant's expertise and defendant's commitment to act for the "mutual benefit" of the parties. Under this interpretation, defendant would not have had the right to act solely in its benefit without consideration of plaintiffs' interests. In fact, Section 6 could be construed as constituting an express covenant to act in good faith. Accordingly, requiring defendant to act in good faith in promoting plaintiffs' flat breads would appear to be an equitable, if not contractually stipulated, result.

Although plaintiffs had a repurchase right under Section 14, the Court cannot accept defendant's argument that this right somehow nullifies any covenant to act in good faith. In deciding not to imply a good faith covenant, the Court in *Vacuum Concrete*, 321 F.Supp. at 773, considered significant the fact that the licensor in that case was free to terminate the license agreement after four years. In that case, however, the licensor also had the ability to market a certain amount of licensed products on its own and was guaranteed an income from the licensee, even if the licensee failed to make any sales. *Id.* at 773–4. As plaintiffs in the instant action had no such rights, the Court declines to place similar significance on plaintiffs' repurchase right.

■ Having determined that defendant was obligated to act in good faith, the next question is whether this obligation restricted defendant's parent company in purchasing JJ Flats, a company producing goods in competition with plaintiffs' flat breads. It is unclear under New York law whether an assignee's/licensee's covenant to act in good faith should limit that party from entering into arrangements in competition with the items assigned/licensed. *See, e.g., Parev Products*, 124 F.2d at 148; *Eastern Elec.,*

*Inc. v. Seeburg Corp.*, 427 F.2d 23, 26 (2d Cir.1970); *City of Yonkers*, 844 F.2d at 46; *Van Valkenburgh*, 30 N.Y.2d at 46, 281 N.E.2d at 145, 330 N.Y.S.2d at 334; *Warfield v. Jerry Vogel Music Co., Inc.,* Copy.L.Rep. (CCH) ¶ 25,005, 1978 WL 944 (S.D.N.Y. March 21, 1978). While the appropriateness of implying a covenant not to compete on an assignee's/licensee's part may be unclear under New York law, the Court has found no case where, without express agreement, the covenant to act in good faith was further extended to restrict the competitive activities of the assignee's/licensee's affiliates. In the instant action, the Agreement is silent as to whether affiliates of Devonsheer or of its transferee could produce and sell competing flat bread products. In fact, the Agreement is entirely silent as to any obligations of affiliates. The parties have not indicated that this silence was modified by a subsequent writing.

"Whether an ambiguity exists in a contract is a threshold question of law to be resolved by the court." *Brass v. American Film Tech., Inc.*, 987 F.2d 142, 149 (2d Cir.1993); *see also Seiden Assoc., Inc. v. ANC Holdings, Inc.* 959 F.2d 425, 429 (2d Cir.1992); *Curry Road Ltd. v. K Mart Corp.*, 893 F.2d 509, 510 (2d Cir.1990). Without an indication in the Agreement or any subsequent document that references to "Purchaser" were intended to encompass not only Devonsheer and any transferee of its interests but such parties' affiliates, the Court declines to find that the Agreement is in any way ambiguous on the issue. *See Curry Road*, 893 F.2d at 510 ("... 'contract language is not ambiguous if it has a definite and precise meaning, unattended by danger of misconception in the purport of the [contract] itself, and concerning which there is no reasonable basis for a difference of opinion.'" (citations omitted)). It is not the Court's role to "rewrite an agreement entered into between knowledgeable parties and effect a result in the derogation of its express terms." *Bayside Fed. Savings and Loan Assoc. v. Cord Meyer Dev. Co.*, 28 A.D.2d 866, 866, 281 N.Y.S.2d 893, 895 (2d Dep't.1967), *aff'd*, 20 N.Y.2d 822, 231 N.E.2d 296, 284 N.Y.S.2d 711 (1967).

The absence of a contractual restriction on competitive activities by JJ Flats or other defendant affiliates does not, however, release defendant from any liability with respect to its obligations under the Agreement. Defendant must still satisfy its general contractual obligation to act in good faith.

Whether a party has acted in good faith is typically a question to be answered by the trier of fact, not in a summary judgment motion. Issues of motive simply are not easily determinable before trial on the basis of a limited record without the ability to assess the credibility of witnesses. *See Brass*, 987 F.2d at 148; *Balderman*, 870 F.2d at 61 (quoting *Ramseur*, 865 F.2d at 465).

The Court's review of the record reveals that there are indeed material issues of fact relating to whether defendant acted in good faith. In dispute is the key factual question of whether defendant's claimed inability to sell plaintiffs' flat bread product was attributable to the product's lack of marketability or to defendant's desire to assist its affiliated company, JJ Flats, in limiting competition. Conflict in the record also exists as to when promotion of plaintiffs' flat breads ended. In a sworn affidavit, Golden states that Golden Associates received its last commission payment in 1989, not early 1988 as defendant claims, and that defendant marketed plaintiffs' flat bread product at least through late 1988, not 1987 as defendant alleges. Termination of sales of plaintiffs' flat breads close to the time that JJ Flats was acquired would lend credence to plaintiffs' assertion that defendant sought to assist JJ Flats in undermining its competition. In light of these factual disputes, defendant has failed to carry its burden of showing that there are no material issues for trial.

Defendant is correct in arguing, however, that it could not have improperly terminated the Agreement as plaintiffs allege in paragraphs 10 and 12 of their complaint. Section 21 of the Agreement clearly states that the Agreement may be terminated only by a writing signed by the parties. No such writing has been offered to the Court or has been alleged to exist. Accordingly, the Agreement continues to remain in effect, and summary judgment in favor of defendant is appropriate as to this claim.

B. *Plaintiffs' Request for an Order with Respect to the Definition of the Term "Products"*

■ In their opposition papers, plaintiffs argue that the Court should enter an order pursuant to Fed.R.Civ.P. 56(d) to the effect that Section 3 of the Agreement requires sales commissions to be paid on all flat bread products, even those produced by JJ Flats. Plaintiffs assert that the language of Section 3 requires commissions to be paid on any net proceeds received by defendant on sales of "Products." "Products," plaintiffs asserts, are broadly defined in a recital at the commencement of the Agreement as "food products which look similar to the thin, crispy crust of 'french bread,' from which the dough has been removed." Therefore, plaintiffs argue, the Court has leeway to construe the Agreement to require commissions to be paid on JJ Flats flat breads. Otherwise, defendant will have circumvented its obligations by having its parent company purchase JJ Flats.

■ Defendant has a two-pronged response to this argument. Defendant asserts that plaintiffs' argument constitutes an inappropriate cross-motion for summary judgment since plaintiffs failed to file a 3(g) statement as required by the Civil Rules of the United States District Courts for the Southern and Eastern Districts of New York. Defendant also argues that the term "Products" is defined in the same paragraph of the Agreement as the technical information and trademarks being transferred are described. Accordingly, "Products" should be defined by reference to these terms. Plaintiffs would then be entitled to sales commissions only on flat bread products produced using technical information supplied by them.

If practicable in cases where a motion for summary judgment is not rendered upon the whole case and a trial is necessary, the Court is obligated under Fed.R.Civ.P. 56(d) "to ascertain what material facts exist without substantial controversy and what material facts are actually and in good faith controverted." The Court finds, therefore, that even though

plaintiffs failed to fulfill the requirements for filing a cross-motion for summary judgment, review of plaintiffs' assertion regarding the definition of "Products" is appropriate in order to delineate material issues for trial. *See Fraser v. Doubleday & Co.*, 587 F.Supp. 1284, 1287 (S.D.N.Y.1984) (stating that pursuant to Fed.R.Civ.P. 56(d), a court may issue an order specifying the facts which do not appear to be in substantial controversy if it finds that full summary judgment cannot be granted because there are other genuine issues of material fact to be tried).

The Second Circuit has held that "[s]ummary judgment as to the meaning of a contract term may not be granted when the term's meaning is not clear or is reasonably susceptible to more than one interpretation." *Record Club of Amer. v. United Artists Records*, 890 F.2d 1264, 1270 (2d Cir.1989); *see also Brass*, 987 F.2d at 148; *Hunt Ltd. v. Lifschultz Fast Freight, Inc.*, 889 F.2d 1274, 1277 (2d Cir.1989). Ambiguous language as been defined as that which is "capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." *Seiden Associates*, 959 F.2d at 428 (citations and internal quotations omitted); *see also Curry Road*, 893 F.2d at 511.

Applying the foregoing guidelines, the Court finds that both plaintiffs' and defendant's claimed definitions of the term "Products" are plausible and that the Agreement is thereby ambiguous on the meaning of the term. Plaintiffs' interpretation of the term is attractive in that the definition, "food products . . .," would directly match the defined term "Products." Defendant's asserted meaning does not comport as elegantly with the text of the recital. Defendant's reading would require concluding that the recital was poorly drafted, as the term "Products" would have no noun as a direct referent.

Defendant's proposed definition, on the other hand, is more in accord with the Agreement as a whole. If plaintiffs' suggested meaning of "Products" were used, the provi-sions in Section 10 for transferring rights and obligations under the Agreement would impose obligations contrary to common sense. Section 10 provides that the "Purchaser" may transfer the trademarks and the technical information to any person, provided that the person, *inter alia*, assumes all of the "Purchaser's" obligations under the Agreement, including those requiring payment of sales commissions. Upon such assumption, the "Purchaser" would be relieved of all its obligations under the Agreement, except for those requiring payments for products sold prior to the date of assignment. Under plaintiffs' interpretation of the term "Products," a transferee would be liable for commissions not only on flat breads the transferee produces using the technical information assigned but also on any flat breads sold after the transfer by the prior "Purchaser," whether or not made using the assigned technical information. The Court seriously doubts that any transferee with an ounce of business sense would agree to assume an obligation to pay commissions on sales of goods over which the transferee would have no control and from which it would receive no benefit.

Although the Agreement is ambiguous as to the proper meaning of the term "Products," clarity as to the meaning of the term is not essential in deciding whether to issue an order under Fed.R.Civ.P. 56(d). Section 3 of the Agreement provides that defendant is obligated to pay Golden Associates a commission on the "net sales proceeds *received by Purchaser* from sales of the Products." (Emphasis added). According to a stipulation of the parties filed on October 5, 1992, Devonsheer, the "Purchaser" under the Agreement, was acquired by Arnold. Arnold is therefore to be substituted for Devonsheer as the "Purchaser." Unless in the assignment of the Agreement from Devonsheer to Arnold, Arnold agreed that its affiliates would have the same contractual obligation to pay commissions as Arnold, and neither party has presented any agreement to this effect, the Court cannot see how JJ Flats, Arnold's indirect affiliate, could be liable to plaintiffs for commissions. Lack of clarity on the meaning of "Products" does not in any

way obscure the unambiguous language in Section 3 limiting plaintiffs' rights to commissions only on net proceeds "received by Purchaser." The Court cannot rewrite a clear provision simply because plaintiffs now perceive the bargain they struck to be unfair.

Although the Court does not need to refer to parol evidence to decide that plaintiffs are not entitled to commissions on sales of JJ Flats flat bread products,[4] the Court notes that Golden's sworn affidavit confirms the Court's reasoning:

> The defendant's obligation was to pay me my commission indefinitely. This was our intent so long as the defendant produced and sold a flat bread product. The defendant sought to get out of this agreement and caused another company (J.J. flats [sic]) to sell it an identical product. This though should not permit the defendant to avoid its obligations under the agreement.

(Golden Aff. at 5.)

The Court therefore concludes that an order pursuant to Fed.R.Civ.P. 56(d) is appropriate and finds that plaintiffs are not entitled under Section 3 of the Agreement to commissions on flat breads sold under the JJ Flats trademark. Obviously, this conclusion does not preclude defendant's liability for any breach of its good faith obligation to promote plaintiffs' flat breads.

C. *Defendant's Motion for Summary Judgment with Respect to the Tortious Interference Claim*

 Defendant is entitled to summary judgment with respect to plaintiffs' claim that defendant tortiously interfered with the Agreement between plaintiffs and Devonsheer. The elements of tortious interference are (1) the existence of a valid contract between plaintiff and a third-party; (2) the defendant's knowledge of the contract; (3) the defendant's intentional procurement of a breach by the third party; and (4) resulting damages. *See Resource Developers, Inc. v. Statue of Liberty–Ellis Island,* 926 F.2d 134, 142 (2d Cir.1991); *Enercomp, Inc. v. McCorhill Publishing, Inc.,* 873 F.2d 536, 541 (2d

Cir.1989); *Universal City Studios, Inc. v. Nintendo of Am., Inc.,* 797 F.2d 70, 75 (2d Cir.1986), *cert. denied,* 479 U.S. 987, 107 S.Ct. 578, 93 L.Ed.2d 581 (1986) (citations omitted). Arnold is the successor in interest to Devonsheer under the Agreement. As such, Arnold cannot be liable in tort for inducing the breach of its own rights and obligations under the Agreement. *See Janmort Leasing, Inc. v. Econo–Car Int'l,* 475 F.Supp. 1282, 1292 (E.D.N.Y.1979). Moreover, Plaintiffs have not alleged that Arnold's purchase of Devonsheer in 1985 was tortious; rather, the tortious interference claimed relates to CPC's purchase of JJ Flats in 1989, an event in which Arnold was not directly involved. Therefore, summary judgment in favor of defendant Arnold is appropriate with respect to this claim.

### CONCLUSION

Based on the foregoing, defendant's motion for summary judgment is denied as to plaintiffs' breach of contract claim, and granted as to plaintiffs' improper termination and tortious interference claims. Pursuant to Fed. R.Civ.P. 56(d), the Court rules that Section 3 of the Agreement does not entitle plaintiffs to commissions from sales of JJ Flats flat bread products.

SO ORDERED.

---

4. Only when contractual terms are ambiguous is parol evidence admissible to show the intent of the parties. *Curry Road,* 893 F.2d at 510; *United*

*States Naval Institute v. Charter Communications, Inc.,* 875 F.2d 1044, 1048 (2d Cir.1989) (citations omitted).